**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **SAM WILSON, JR., et.al,** | |
| *Plaintiffs*, | |
| v. | Civil Action No.: 8:20-cv-1344 |
| **EAGLE NATIONAL BANK, et. al ,** | |
| *Defendant*s. | |

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Sam Wilson, Jr. and John and Jackie Unthank, on behalf of themselves and the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith and Melissa L. English of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney and Veronica B. Nannis of Joseph, Greenwald and Laake, P.A., file this Amended Class Action Complaint, and state as follows:

**INTRODUCTION**

1.  Plaintiffs Sam Wilson, Jr. ("Wilson"), John and Jackie Unthank (collectively, the "Unthanks"), and alleged Class Members are borrowers who currently have or had a federally related mortgage loan originated and/or brokered by Defendants Eagle National Bank and/or Eagle Nationwide Mortgage Company and/or Eagle National Bancorp, Inc. (collectively, the "Eagle Defendants"), predecessor to ESSA Bank & Trust and/or ESSA Bancorp, Inc. (collectively, "ESSA") (together with the Eagle Defendants, "Defendants").

1

2.      Plaintiffs and alleged Class Members are victims of an illegal kickback scheme ("All Star Scheme") under which the Eagle Defendants' loan officers, agents, and/or other employees received and accepted illegal kickbacks from All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company, in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*

3.      To fund the kickbacks, the Eagle Defendants and All Star enter into naked price fixing agreements, agreeing to charge Eagle borrowers fixed and unnecessarily increased title and settlement service fees, including amounts that were not associated with any legitimate title or settlement service and imposed for the sole purpose of funding the illegal kickbacks.

4.      The Eagle Defendants fraudulently concealed the All Star Scheme from Plaintiffs and alleged Class Members by agreeing to and laundering kickbacks through third party marketing companies, false allocation of title and settlement fees and manipulation of the APR associated with Eagle loans, and false and fraudulent representations and omissions in Eagle borrowers' HUD-1s, Good Faith Estimates and other loan documents.  These concealments prevented borrowers, regulators and auditors from discovering the scheme and the injuries to borrowers therefrom, thereby allowing the kickbacks and fixed and fraudulent charges to continue.

## **PARTIES**

5.      Plaintiffs bring this action pursuant to Fed. R. of Civ. P. 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

6.      Plaintiff Sam Wilson, Jr. is a citizen and resident of Prince George's County, Maryland.

7.      Plaintiffs John and Jackie Unthank are citizens and residents of Frederick County, Maryland.

8.      Defendant Eagle National Bank is and/or was a national banking association based in Pennsylvania. At all relevant times, Eagle National Bank, through its wholly owned subsidiary Eagle Nationwide Mortgage Company, was engaged in the business of consumer mortgage brokering and/or lending and/or otherwise transacted business in Maryland and elsewhere.

9.      Defendant Eagle Nationwide Mortgage Company is and/or was a Pennsylvania corporation and is and/or was a wholly owned subsidiary of Eagle National Bank and is and/or was engaged in the business of consumer mortgage brokering and/or lending and/or otherwise transacted business in Maryland and elsewhere.

10.     Defendant Eagle National Bancorp, Inc. is a Pennsylvania corporation and the holding company of Defendants Eagle National Bank and Eagle Nationwide Mortgage Company.

11.     Defendant ESSA Bancorp, Inc. is a Pennsylvania corporation and the holding company of Defendant ESSA Bank & Trust.   According to public filings, Defendant ESSA Bancorp, Inc. acquired Eagle National Bancorp, Inc., including Eagle National Bank and its wholly owned subsidiary Eagle Nationwide Mortgage Company, by a merger completed on December 4, 2015 and pursuant to a Plan of Merger filed with the Securities Exchange Commission on July 28, 2015.  Specifically, Section 2.01 of the Plan of Merger states:

> (b) *The Second Merger*.  Immediately following the Merger, EN Bancorp will merge with and into ESSA Bancorp, with ESSA Bancorp as the surviving entity. The separate existence of EN Bancorp shall cease, and all of the property (real, personal and mixed), rights, powers and duties and

obligations of EN Bancorp shall be transferred to and assumed by ESSA Bancorp as the surviving entity in the Second Merger, without further act or deed, all in accordance with the PBCL. . . .

(c) *The Bank Merger.*  Immediately following the Second Merger, Eagle Bank shall merge with and into ESSA Bank, with ESSA Bank as the surviving entity pursuant to the Bank Merger Agreement substantially in the form of Exhibit B hereto. The directors and officers of ESSA Bank immediately prior to the Bank Merger Effective Date shall be the initial directors and officers of the surviving entity, in each case until their respective successors are duly elected or appointed and qualified. . . .

12.   Defendant ESSA Bank & Trust is a Pennsylvania chartered stock savings bank and upon information and belief is the successor-in-interest to Defendant Eagle National Bank.

13.   According to public filings, as a result of the merger, Defendants ESSA Bancorp, Inc. and ESSA Bank & Trust are liable for all the debts, liabilities, and obligations of Defendants Eagle National  Bancorp, Inc., Eagle National Bank, and Eagle Nationwide Mortgage Company, in accordance with 15 Pa. C.S. § 336 and the terms of the Plan of Merger.

**JURISDICTION AND VENUE**

14.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

15.   This Court has personal jurisdiction over the parties. Personal jurisdiction over Defendants Eagle National Bank, Eagle Nationwide Mortgage Company, and Eagle National Bancorp Inc. is appropriate because these Defendants transacted business in Maryland, and such jurisdiction extends to Defendants ESSA Bank & Trust and ESSA Bancorp, Inc. as the successor entities.

16.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this District and the

Eagle Defendants systematically and continually transacted business in this District during the applicable time period.

**FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF**

17.   At all relevant times, All Star is a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration. All Star is a licensed title and settlement service provider in more than 30 states and provides title and settlement services on residential mortgage loans, refinances and reverse mortgages.

I.     **The All Star Scheme**

    A.   **All Star and Participating Lenders Pay and Receive Kickbacks in Exchange for the Assignment and Referral of Residential Mortgage Loans to All Star.**

18.   Beginning by at least 2008, All Star designs and executes a scheme ("All Star Scheme") to pay kickbacks to various mortgage lenders and their brokers, loan officers and other employees (collectively, "Participating Lenders") in exchange for the Participating Lender's assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

19.   To fund the kickbacks, All Star and the Participating Lender agree to charge borrowers fixed prices for title and settlement services on loans assigned and referred under the Kickback Agreement ("Price Fixing Agreement").

20.   These fixed prices are based on how many loans the Participating Lender is assigning and referring to All Star under the Kickback Agreement, and how much the Participating Lender is receiving and accepting in kickbacks.

21.   The fixed prices are higher than All Star would otherwise charge for similar title and settlement services ("Participating Lender Overcharge") and include amounts that are not

associated with any legitimate title or settlement service and charged solely to fund the illegal kickbacks ("Kickback Overcharge").

**B.      All Star and Participating Lenders Use A Web of Concealments to Hide the Kickbacks, Overcharges, and All Star Scheme from Borrowers, Regulators and Auditors.**

22.    Concealment from borrowers, regulators and auditors is essential to the success and continuation of the All Star Scheme and the illegal kickbacks.  All Star and Participating Lenders use a variety of tactics to conceal the illegal kickbacks, the Kickback and Price Fixing Agreements, the resulting overcharges, and the coordinated relationship between All Star and the Participating Lender.

23.    As an integral part of the All Star Scheme, All Star and the Participating Lender agree to launder the kickbacks through a third party marketing company.

24.    All Star does not regularly use marketing companies for marketing services, nor does All Star directly solicit borrowers. In contrast, a Participating Lender and/or its branch managers, mortgage brokers, loan officers, or other employees frequently use third party marketing companies (such as a direct mail, data and/or leads lists, telemarketing or live transfer leads providers) to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances and reverse mortgages from the Participating Lender.

25.    Under the Kickback Agreement, a Participating Lender receiving and accepting the kickback from All Star identifies a third party marketing company that the Participating Lender is using for its marketing services.  All Star then makes the kickback payment to the third party marketing company (a thing of value to the Participating Lender), and the Participating Lender receives and accepts the kickback payment when the third party

marketing company applies All Star's payment for the benefit of the Participating Lender and for the services that the Participating Lender is receiving.

26. All Star's payment laundered through the third party marketing company is an express payment for the benefit of the Participating Lender for the assignment and referral of loans under the Kickback Agreement and not a payment to the third party marketing company for legitimate marketing services; in fact, All Star receives no marketing services from the third party marketing company.

27. All Star and Participating Lenders launder the kickbacks through the third party marketing companies to conceal that the payments are kickbacks and to create the false impression that All Star is making payments for legitimate marketing services. In fact, All Star does not receive any legitimate marketing services from the third party marketing companies laundering the kickbacks. To be clear, All Star's payments laundered by the third party marketing companies were always and solely for the benefit of the Participating Lender and in exchange for the Participating Lender's assignment and referral of loans under the Kickback Agreement, and not for the third party marketing company's provision of any goods or services to All Star.

28. Laundering the kickbacks through third party marketing allows All Star and the Participating Lender to conceal from borrowers, regulators and law enforcement the fact that anything of value was exchanged between All Star and the Participating Lender, as well as the fact and amount of kickbacks.

29. To even further conceal the kickbacks and the All Star Scheme, All Star and the Participating Lender cause the third party marketing company to create sham invoices to create the false impression that All Star is paying for, and receiving, legitimate marketing

services from the third party marketing company.  In fact, All Star does not receive any legitimate marketing services from the marketing company and All Star's payment is applied solely for the benefit of the Participating Lender and to induce it to send loan referrals pursuant to the Kickback Agreement.

30.     To further conceal the Participating Lender and Kickback Overcharges from borrowers, All Star and the Participating Lender make false and fraudulent representations and omissions in borrowers' loan documents, including the Truth In Lending Act ("TILA") Disclosure, the Good Faith Estimate and the HUD-1 Settlement Statement.

31.     In addition, All Star and the Participating Lender agree to and do not identify the amounts associated with the illegal kickback or Participating Lender and Kickback Overcharges on any loan documents, including government mandated disclosure forms such as the "Good Faith" Estimate and HUD-1 Settlement Statement.

**C.     All Star and Participating Lenders Erect An Elaborate Co-Marketing Sham but All Star Receives no Marketing Benefit and Makes Clear that the Payments are Solely for the Assignment and Referral of Loans.**

32.     To add another layer of concealment, All Star constructs an elaborate sham with the Participating Lender to create the false impression that All Star and the Participating Lender are "co-marketing."

33.     In furtherance of this sham, All Star and the Participating Lender agree to nominally include All Star on direct mail solicitations, such as direct mailers sent to borrowers. These solicitations are a sham, and fraudulent, because the Participating Lender requires, and All Star agrees, to purposefully design the mailers to prevent borrowers from contacting All Star and to ensure the borrower will only contact the Participating Lender.

34.    For example, All Star and the Participating agree and choose to omit any phone number, website, or contact information for All Star, and only provide a phone number for the Participating Lender so there is no chance that a borrower would contact All Star instead of the Participating Lender.

35.    The prototype for the "co-marketing" sham was developed by a postcard company contracted by All Star.  The postcard company advised that the aim was to avoid the borrower calling All Star:

> We played around with the design a bit and what we're running into is that if we use 25-50% of the card with All Star Title's info, it makes it confusing for the person receiving the card as they can't tell who the advertisement is from. We came up with a mockup with a smaller All Star Title logo so that it doesn't totally distract from the mortgage company's information. We also removed your phone number because we don't want people to call you instead of the mortgage company.

*See* September 28, 2009 emails related to design of mailers attached as **Exhibit 1.** In 2010, All Star notified the postcard company, "We actually started a similar program with other direct mail companies and its going really really well." **Ex. 1.**

36.    By design, All Star receives no actual marketing benefit from the solicitation and the entire marketing benefit flows to the Participating Lender. In exchange, under the Kickback Agreement, the Participating Lender agrees and is required to assign and refer all loans generated by the mailer to All Star for title and settlement services.  Despite the sham of including All Star in the mailer, the benefit All Star in fact receives is the referral from the Participating Lender.

37.    In addition, as advised by All Star's early prototype, All Star and the Participating Lender agree to limit All Star to a negligible presence on the solicitation, with All Star occupying less than 1/5 or less of the surface area of a solicitation. The payment made by All Star to

the Participating Lender is far greater, and not reasonably related, to All Star's nominal presence in the solicitations. The inclusion of All Star on any material at all is solely for the purpose of attempting to conceal the kickbacks.

38.    The sham solicitations live up to the intended purpose.  Despite making millions in payments, All Star does not receive any marketing benefit from the sham solicitations and not a single call from a borrower.  All of All Star's business continues to flow from loans assigned and referred from a Participating Lender and subject to the payment of kickbacks.

39.    The Consumer Financial Protection Board (CFPB), the federal agency responsible for RESPA enforcement, has identified that during the time period applicable to the All Star Scheme, sham "co-marketing" was so prevalent as to cause the Consumer Financial Protection Bureau ("CFPB") to issue a compliance bulletin concluding that "[b]ased on the Bureau's investigative efforts, it appears that many [marketing service agreements] are designed to evade RESPA's prohibition on the payment and acceptance of kickbacks and referral fees." Consumer Fin. Prot. Bureau Compliance Bulletin 2015-05, https://files.consumerfinance.gov/f/201510_cfpb_compliance-bulletin-2015-05-respa-compliance-and-marketing-services-agreements.pdf.

40.    In describing the type of agreements that were used as sham fronts for illegal kickbacks, the CFPB detailed a scheme indistinguishable from the one designed by All Star for the Participating Lenders in the All Star Scheme:

> [I[]n another matter that resulted in an enforcement action, **a title company entered into unwritten agreements with individual loan officers in which it paid for the referrals by defraying the loan officers' marketing expenses.** The title company supplied loan officers with valuable lead information and marketing materials. In exchange, the loan officers sent referrals to the title

10

company. The lenders did not detect these RESPA violations
and/or correct or prevent them, even when they had reason to know
that the title company was defraying the marketing expenses of the
lenders and their loan officers.

*Id.* (emphasis added).

41.    While building the sham of "co-marketing," All Star makes clear to the Participating

Lender that the payment to the Participating Lender is solely for the assignment and

referral of loans for title and settlement services and attaches a production goal – referred

to as a "unit goal" - to each kickback paid to a Participating Lender. As Jason Horwitz,

the President and owner of All Star and the architect of the All Star Scheme described it:

> …the "unit goal" can be met with closings from the mail, or any other
> source. It doesn't matter where its from, as long as we hit that unit
> number. Basically the agreement would be that we do not contribute to
> another campaign until we hit that unit goal.

*See* June 22, 2011 email attached as  **Exhibit 2.**

42.    All Star and the Participating Lender perform the "unit goal" requirements of the

Kickback Agreement with All Star paying kickbacks only after requiring a Participating

Lender to document the number and value of the loans assigned and referred to All Star

under the Kickback Agreement since the last kickback payment, and, on more than one

occasion, leaving Horwitz to expressly withhold payment until the unit goal (loan referral

goal) was met:

> **"Ok. Just so we're clear, I'm not dropping $1 more until we
> close 25 NEW loans."**

*See* February 6, 2013 email attached as **Exhibit 3** (capitalization in original and

bold type added).

**II.     By late 2009, the Eagle Defendants Become a Participating Lender in the All Star Scheme, Performing Kickback and Price Fixing Agreements with All Star that Affect Hundreds of Eagle Loans Across at Least Three Branches.**

43.     At all relevant times, the Eagle Defendants' branch managers and loan officers participating in the All Star Scheme were licensed mortgage brokers and/or authorized loan officers, and at all relevant times were acting within scope of the business relationship and duties of their employment on behalf of the Eagle Defendants, specifically seeking borrowers and originating and securing loans for residential mortgages through the Eagle Defendants and/or brokering such loans through the Eagle Defendants  to other lenders with whom the Eagle Defendants are authorized, referring Eagle borrowers to title companies, and working with title companies to close these loans.  All activities, including any interaction with All Star, were for the benefit of the Eagle Defendants.

**A.     The Eagle Defendants Receive and Accept Hundreds of Thousands of Dollars in Kickbacks for the Assignment and Referral of Hundreds of Eagle Loans.**

44.     By at least 2009, the Eagle Defendants, by and through its branch managers, loan officers and other employees, agree to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of Eagle loans to All Star for title and settlement services.

45.     From the beginning, All Star made clear its kickback payments to the Eagle Defendants are predicated on and will continue only if the Eagle Defendants  meet a "unit goal" or "production" goal of loans that are assigned and referred to All Star in exchange for the kickback.  *See* June 1, 2010 e-mail regarding Eagle Defendants, attached as **Exhibit 4**; *see also* July 8, 2010 e-mail re: "Hagy Loans" expectations, attached as **Exhibit 5**.

46.     All Star frequently reiterates that each kickback payment comes with a "unit goal" or production requirement of loans the Eagle Defendants are required to assign and refer to

All Star in exchange for the kickbacks.  *See* May 11 and 24, 2010 e-mails re: fee agreement, collectively attached as **Exhibit 7**.

> i.  **The Eagle Defendants Receive and Accept More Than $100,000 in Kickbacks Related to Loans Assigned and Referred by the Eagle Forest Hill Branch.**

47.  The Eagle Defendants operate a branch office located at 350 Bynum Road, Forest Hill, Maryland 21050 ("Eagle Forest Hill Branch").

48.  During the relevant time period, Alex Mavroulis, Bret Springer, David Hagy, Mike Balzano, Mike Marcellino, Reggie Hyacinthe, Nick Hapsis, Gary Becker, Steve Oh, Mike Varlotta, Mike Bosworth, Andre Samuel, and Bill Biensach were branch managers and/or loan officers employed by the Eagle Defendants at the Eagle Forest Hill Branch.

49.  From November 2009 through January 2011, All Star pays, and the Eagle Defendants receive and accept, kickbacks for the assignment and referral of Eagle loans from the Eagle Forest Hill Branch.  These kickbacks are laundered by and through various third party marketing companies:

    a.  $1,432.08 kickback on January 26, 2010, laundered by and through Influence Direct Inc., a Tennessee based data and lead list provider ("Influence Direct");

    b.  $4,608 kickback on January 28, 2010, laundered by and through Influence Direct;

    c.  $4,478.24 kickback on February 3, 2010, laundered by and through Jemco Graphics Services, Inc., a Maryland-based direct mail printing company ("Jemco");

    d.  $2,538.21 kickback on February 4, 2010, laundered by and through Influence Direct;

  e. $3,807.07 kickback on February 5, 2010, laundered by and through Influence Direct;

  f. $8,392.70 kickback on February 10, 2010, laundered by and through Influence Direct;

  g. $8,226.98 kickback on February 17, 2010, laundered by and through Influence Direct;

  h. $8,228.47 kickback on February 25, 2010, laundered by and through Influence Direct;

  i. $7,330.55 kickback on March 3, 2010, laundered by and through Influence Direct;

  j. $2,080 kickback on May 28, 2010, laundered by and through Jemco;

  k. $3,014.07 kickback on June 2, 2010, laundered by and through Influence Direct;

  l. $1,014 kickback on June 3, 2010, laundered by and through Influence Direct;

  m. $8,030.64 kickback on June 9, 2010, laundered by and through Influence Direct;

  n. $1,149 kickback on June 11, 2010, laundered by and through Jemco;

  o. $1,034.60 kickback on June 16, 2010, laundered by and through Influence Direct;

  p. $4,578.70 kickback on June 21, 2010, laundered by and through Influence Direct;

  q. $8,023.27 kickback on July 1, 2010, laundered by and through Influence Direct;

  r. $320 kickback on July 2, 2010, laundered by and through Tranzact Information Services, LLC ("Tranzact"), a Florida-based data and direct mail marketing company;

  s. $6,986.73 kickback on July 8, 2010, laundered by and through Influence Direct;

  t. $8,322.88 kickback on July 14, 2010, laundered by and through Influence Direct;

u.  $1,137.56 kickback on July 30, 2010, laundered by and through Influence Direct;

v.  $1,521.45 kickback on August 6, 2010, laundered by and through Influence Direct;

w.  $980 kickback on September 20, 2010, laundered by and through Influence Direct;

x.  $320.01 kickback on September 23, 2010, laundered by and through Tranzact;

y.  $703.80 kickback on September 23, 2010, laundered by and through Influence Direct;

z.  $4,890.08 kickback on September 23, 2010, laundered by and through Influence Direct;

aa. $3,745.94 kickback on October 1, 2010, laundered by and through Influence Direct;

bb. $3,307.63 kickback on October 7, 2010, laundered by and through Influence Direct;

cc. $980 kickback on October 13, 2010, laundered by and through Influence Direct;

dd. $3,177.29 kickback on October 14, 2010, laundered by and through Influence Direct;

ee. $2,231.46 kickback on October 20, 2010, laundered by and through Influence Direct; and

ff.  $1,100 kickback on October 20, 2010, laundered by and through Influence Direct.

50.   All Star's laundering of payments through Influence Direct, Jemco and Tranzact for the

benefit of the Eagle Defendants are expressly payments for the referral of Eagle loans by

the Eagle Forest Hill Branch to All Star and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star.

51.     Between October 2009 and January 2011, the Eagle Forest Hill Branch assigns and refers more than 360 Eagle loans, secured by property in 40 states, pursuant to the Kickback Agreements.

<blockquote>

**ii.     The Eagle Defendants Receive and Accept at Least $50,000 in Kickbacks Related to Loans Assigned and Referred by the Eagle Bel Air Branch.**

</blockquote>

52.     The Eagle Defendants also operate a branch located at 1A Vale Road Bel Air, Maryland 21014 ("Eagle Bel Air Branch").  The Eagle Defendants employ a number of licensed mortgage loan originators and loan officers in the Eagle Bel Air Branch, including Angela Pobletts, Ryan Rojek, Michael Carter, Jason McCotter and Michelle Botley.

53.     From November 2009 through January 2011, All Star pays, and the Eagle Defendants receive and accept, kickbacks for the assignment and referral of Eagle loans from the Eagle Bel Air Branch.  These kickbacks are laundered by and through various third party marketing companies:

    a.   $6,800 kickback on March 4, 2010, laundered by and through Influence Direct;

    b.    $7,450.76 kickback on March 18, 2010, laundered by and through Influence Direct;

    c.    $1,608 kickback on March 30, 2010, laundered by and through Lendanear Data & Direct Mail Services ("Lendanear"), a Tennessee-based data and direct mail company;

    d.   $6,834 kickback on April 6, 2010, laundered by and through Influence Direct;

    e.   $1,600 kickback on April 26, 2010, laundered by and through Lendanear;

     f.    $7,210 kickback on May 3, 2010, laundered by and through Influence Direct;

     g.    $800 kickback on May 17, 2010, laundered by and through Lendanear;

     h.    $3,605 kickback on May 18, 2010, laundered by and through Influence Direct;

     i.    $1,600 kickback on June 3, 2010, laundered by and through Lendanear;

     j.    $7,038 kickback on June 3, 2010, laundered by and through Influence Direct; and

     k.    $5,728.50 on July 13, 2010, laundered by and through Influence Direct.

54.    All Star's laundering of payments through Influence Direct and Lendanear for the benefit of the Eagle Defendants are expressly payments for the referral of borrowers by the Eagle Bel Air Branch and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star.

55.    The Eagle Bel Air Branch in fact assigns and refers more than 130 Eagle loans secured by real property in 32 states and the District of Columbia pursuant to the Kickback and Price Fixing Agreements.

        iii.    **The Eagle Defendants Receive and Accept at Least $6,000 in Kickbacks Related to Loans Assigned and Referred by the Eagle Owings Mills Branch.**

56.    The Eagle Defendants operate a branch located at 90 Painters Mill Road in Owings Mills, Maryland 21117 ("Eagle Owings Mills Branch") in which the Eagle Defendants employ licensed mortgage loan originator and loan officer Adam Ellis.

57.    During 2010, All Star paid, and the Eagle Defendants receive an accept, kickbacks for the assignment and referral of Eagle loans from the Eagle Owings Mills Branch.  These kickbacks were laundered by and through various third party marketing companies:

     a.    $376.74 kickback on July 29, 2010, laundered by and through Lendanear;

     b.    $1,690.99 kickback on July 29, 2010, laundered by and through Influence Direct;

17

  c.  $1,724.66 kickback on  August 18, 2010, laundered by and through Influence Direct;

  d.  $370 kickback on September 8, 2010, laundered by and through Lendanear; and

  e.  $1,976.03 kickback on September 9, 2010, laundered by and through Influence Direct.

58.  All Star's laundering of payments through Influence Direct and Lendanear for the benefit of the Eagle Defendants are expressly payments for the referral of borrowers by the Eagle Owings Mills Branch and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star.

59.  All Star once again makes clear to the Eagle Defendants that the kickbacks are paid expressly for the assignment and referral of Eagle loans, with Jason Horwitz, All Star's owner, stating:

> i [sic] dont give a [expletive] if the mailer bombed - just a heads up, I'm doing 4 drops for him, thats it, and getting the 12 deals. If they bitch about it or dont hold up to their end, i might be done doing marketing for them altogether.

*See* Oct. 11, 2010 email from  J. Horwitz, attached as **Exhibit 11.**

60.  The Eagle Owings Mills Branch in fact assigns and refers at least twelve Eagle loans secured by real property in three states pursuant to the Kickback and Price Fixing Agreements.

61.  Based on the Eagle Defendants' and All Star's continuing pattern of practice and course of conduct, Plaintiffs believe, and therefore allege, that the Eagle Defendants enter Kickback Agreements related to other Eagle branches, branch manager and loan officers, including, without limitation, loan officers, branch managers and others employed by the Eagle Defendants in the Eagle branch located at 1706 N. 2d Street,

Philadelphia, Pennsylvania, and including Eagle loan officers and employees Steve Gow, Brian Clark, Adam Finkel, Chris Fanciosa, Melissa Farrell and Debra Sherry.

62.     Based on the continuing pattern of practice between All Star and the Eagle Defendants, Plaintiffs believe, and therefore allege, that the Eagle Defendants and All Star launder kickbacks by and through other third-party marketing companies in addition to those identified herein, including, without limitation, Reliable Leads, Inc.

> **iv.     The Eagle Defendants Provided No Goods, Services or Facilities to All Star in Exchange for the Kickbacks and Are Not Entitled to the Protection of 12 U.S.C. §2607(c)(2).**

63.     No good, facilities, or services are provided by any of the Eagle Defendant's employees and/or agents, associated with the receipt and acceptance of the kickbacks.  The payment by All Star and the receipt and acceptance by the Eagle Defendants of the kickbacks are made expressly and solely for the assignment and referral by the Eagle Defendants of Eagle borrowers to All Star.

64.     In each instance, the payments made by All Star which are laundered through third party marketing companies were express payments for the referral of borrowers by the Eagle Defendants to All Star and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star.

65.     In furtherance of the "co-marketing" sham integral to the All Star Scheme, All Star is nominally in included in some Eagle borrower solicitations and at other times not included. But, consistent with All Star's early prototypes, no phone number or other contact information is included on any Eagle solicitation and All Star is included in only a very small way, if at all. *See, e.g.,* **Exhibit 12.**

66.   True to its design and intent, All Star does not receive any marketing benefit from any Eagle solicitation.  Instead, borrowers contact the Eagle Defendants' branch managers, loan officers and other employees who assign and refer the Eagle borrower's loan to All Star under the Kickback Agreement and for the purpose of receiving the next kickback.

67.   In addition, and in the alternative, any payment laundered through the third party marketing companies by All Star on behalf of the Eagle Defendants is not reasonably related to the value of any good, facility or service that may have been provided by the Eagle Defendants or the third party marketing companies to All Star.  Jason Horwitz, All Star's owner, admits to Eagle Bel Air Branch manager and loan officer Angela Pobletts that All Star is only barely visible on an Eagle mailer:

On Mar 4, 2010, at 3:59 PM, "Jason" <jason@allstartitleinc.com> wrote:

> haha, uhh i was thinking the All Star part was a little more visible...lol i almost couldnt find it!
> Maybe next time we'll see how we can change it to maybe make our portion a little bigger or
> something...

**From:** Angela Pobletts [mailto:Angela.Pobletts@enmcdirect.com]
**Sent:** Thursday, March 04, 2010 3:46 PM
**To:** Jason
**Subject:** Fwd: Eagle Proof 35163 revision 3

*See* **Exhibit 12.**

68.   Because the payments by All Star are not reasonably related to the value of any purported good, facility or service provided to All Star by the Eagle Defendants, the payments are not entitled to the protection of 12 U.S.C. §2607(c)(2).

**B. To Pay for the Kickbacks, the Eagle Defendants and All Star Enter and Perform Naked Price Fixing Agreements Related to the Title and Settlement Service Charges on Eagle Loans Assigned and Referred in Furtherance of the Kickback Agreements.**

69.    To pay for the kickbacks, the Eagle Defendants and All Star conspire and agree to fix the prices charged borrowers on loans assigned and referred by the Eagle Defendants' various branches.

  i.  **The Eagle Defendants Conspire and Agree to Fix Prices Related to Loans Assigned and Referred to All Star From the Eagle Forest Hill Branch.**

70.    The Eagle Defendants and All Star conspire and agree to fix the prices charged borrowers on Eagle loans assigned and referred by the Eagle Forest Hill Branch under the Kickback Agreement at $1,300 including title insurance. *See, e.g.,* Feb. 25, 2010 email between S. Oh and J. Horwitz attached as **Exhibit 6.**

71.    These fixed prices are $50 higher than the fixed prices All Star is charging on loans assigned and referred from other lenders, which amount constitutes the Eagle Overcharge.  In addition, $300 of these fixed prices is charged for the sole purpose of funding the kickbacks and is not associated with any legitimate title or settlement service ("Kickback Overcharge"). These Eagle and Kickback Overcharges are the minimum amount of actual damages incurred by Eagle borrowers assigned and referred during this period pursuant to the Kickback Agreement.

72.    By August 2010, while the Eagle Defendants were receiving thousands of dollar in kickbacks, the Eagle Defendants and All Star conspire and agree to raise the fixed prices for title and settlement services associated with Eagle loans referred to All Star by the Eagle Forest Hill Branch to: (a) $1,500 including title insurance for loans assigned and referred by Eagle loan officers Gary Becker, Mike Marcellino, Nick Hapsis, and Alex Mavroulis; (b) $950 including title insurance for loans assigned and referred by Eagle loan officers Mike Varlotta, Steve Oh, Andre Samuel, and Billy Biensach; (c) $2,000

including title insurance for loans assigned and referred by Eagle loan officer Reggie Hyacinthe; and (d) $1,300 including title insurance for loans assigned and referred by Eagle loan officer David Hagy. *See* Aug. 3, 2010 Title Fee Structure Chart, attached as **Exhibit 8**.

73. These fixed prices are $50-200 higher than the prices All Star charges borrowers assigned and referred to All Star from other lenders and is the Eagle Overcharge for borrowers assigned and referred by the Eagle Forest Hill Branch during this time period. These fixed prices also include a minimum of $300 Kickback Overcharge which, together with the Eagle Overcharge, is the minimum amount of actual damages incurred by the borrowers assigned and referred during this period pursuant to the Kickback and Price Fixing Agreements.

74. In October, 2010, the Eagle Defendants and All Star conspired and agreed to fix even higher the prices charged borrowers on loans assigned and referred to All Star by the Eagle Forest Hill Branch to: (a) $1,000 including title insurance for loans assigned and referred by Gary Becker, Mike Marcellino, Steve Oh, Mike Varlotta, and Alex Mavroulis; (b) $1,850 including title insurance for loans assigned and referred by Andre Samuel; (c) $1,500 including title insurance for loans assigned and referred by Mike Balzano; (d) $1,625 including title insurance for loans assigned and referred by Nick Hapsis and Billy Biensach; and (e) $2,000 including title insurance for loans assigned and referred by Reggie Hyacinthe and Dave Hagy. *See* Oct. 1, 2010 Title Fee Structure Chart, **Exhibit 10**.

75. These fixed prices are $250-1,000 higher than the prices fixed for loans assigned and referred to All Star by other lenders and represent the Eagle Overcharge. These fixed

prices also include a minimum $300 Kickback Overcharge, which, together with the Eagle Overcharge, is the minimum amount of actual damages sustained by borrowers assigned and referred by the Eagle Forest Hill Branch during this time in performance of the Kickback and Price Fixing Agreements.

       ii.   **The Eagle Defendants Conspire and Agree to Fix Prices Related to Loans Assigned and Referred to All Star From the Eagle Bel Air Branch.**

76.    At the same time All Star begins paying kickbacks to the Eagle Defendants associated with loans assigned and referred from the Eagle Bel Air Branch, All Star and the Eagle Defendants conspire and agree to fix prices charged borrowers on loans assigned and referred by the Eagle Bel Air Branch at $1,400. *See* Mar. 4, 2010 e-mails, attached as **Exhibit 12**.

77.    These fixed prices are at least $150 higher than the fixed prices All Star is charging loans assigned and referred to All Star from other lenders, which amount is the Eagle Overcharge associated with loans assigned and referred from the Eagle Bel Air Branch. A minimum of $300 of these fixed prices is a Kickback Overcharge, an amount charged for the sole purpose of funding the kickback and not associated with any legitimate title or settlement service. These Eagle and Kickback Overcharges are the minimum amount of actual damages incurred by the borrowers assigned and referred by the Eagle Bel Air Branch during this period pursuant to the Kickback and Price Fixing Agreements.

78.    Later that month, All Star and the Eagle Defendants conspire to and agree to fix prices for title and settlement services associated with Eagle loans assigned and referred to All Star by the Eagle Bel Air Branch at $2,000 including title insurance for Streamline mortgage loans, and at least $2,000 for Reverse mortgage loans and "Full Doc"

mortgage loans (a loan where all income and assets are documented, commonly used for financing a home purchase).  *See* Mar. 24, 2010 e-mail, attached as **Exhibit 13**.

79.     These fixed prices are approximately $600 more than All Star is charging loans assigned and referred to All Star from other lenders. *See* Mar. 24, 2010 emails between MBA Mortgage and J. Horwitz, attached as **Exhibit 14.**  This Eagle Overcharge, together with the Kickback Overcharge,  is the minimum amount of actual damages incurred by Eagle borrowers assigned and referred to All Star from the Eagle Bel Air Branch during this time period in performance of the Kickback and Price Fixing Agreements.

> iii.  **The Eagle Defendants Conspire and Agree to Fix Prices Related to Loans Assigned and Referred to All Star From the Eagle Owings Mills Branch.**

80.     The Eagle Defendants and All Star conspire and agree to fix prices charged on Eagle loans assigned and referred by the Eagle Owings Mills Branch at $2,000. *See* June 4, 2010 e-mail, attached as **Exhibit 15**.

81.     These fixed prices are between $150-700 higher than All Star is charging on loans assigned and referred by other lenders, which amount represents the Eagle Overcharge. In addition, these fixed prices contain a minimum $300 Kickback Overcharge for the amounts charged to pay for the kickbacks and not associated with any legitimate title or settlement service.  These Eagle and Kickback Overcharges are the minimum amount of actual damages sustained by borrowers on loans assigned and referred by the Eagle Owings Mills Branch during this time period in performance of the Kickback and Price Fixing Agreements.

82.     In August 2010, the Eagle Defendants and All Star conspire  and agree to fix prices charged borrowers assigned and referred by Eagle Owings Mills Branch at $2,000

including title insurance in all states in which All Star is licensed and $2,400 including title insurance in Louisiana, North Carolina, Georgia, Massachusetts, South Carolina and Delaware. *See* **Exhibit 8**.

83.     These fixed prices continue the Eagle and Kickback Overcharges and are the minimum amount of actual damages incurred by Eagle borrowers assigned and referred from the Eagle Owings Mills Branch during this time period in performance of the Kickback and Price Fixing Agreements.

> **v.     The Eagle Defendants Price Fixing Agreements Extend to their Internal Title Company, Eagle Nationwide Title Agency.**

84.     During the relevant time period, the Eagle Defendants operate their own title services business, Eagle Nationwide Title Agency a/k/a Eagle Nationwide Abstract Company ("Eagle Title") which functions as the Eagle Defendant's internal title company.

85.     The Eagle Defendants regularly represent to borrowers that the prices for title and settlement service charges reported by the Eagle Defendants to borrowers on Good Faith Estimates and other government-mandated disclosures are from its title services company, Eagle Title.

86.     The Eagle Defendants regularly disclose to borrowers their affiliated business relationship with Eagle Title on a Written List of Settlement Service Providers.

87.     Eagle National regularly issues an Affiliated Business Disclosure Statement to borrowers which states: "to assist our customers in selecting the finance options that best suit their needs, we may refer them from one affiliate to another. Since those referrals may result in a financial or other benefit to Eagle National Bank, Eagle Nationwide Mortgage Company, Eagle Nationwide Abstract Company or Eagle Nationwide Title Agency, federal law requires that we provide you with this disclosure."

88.   The Eagle Defendants extend their Price Fixing Agreements with All Star to the prices charged by Eagle Title and reported to the Eagle Defendants' borrowers on the Good Faith Estimate and the Written List of Settlement Service Providers.

89.   For example, in August of 2010, the Eagle Defendants and All Star conspire and agree to fix prices charged borrowers assigned and referred by Eagle Owings Mills Branch at $2,000 including title insurance in all but a handful of state.   Disclosures issued on loans assigned and referred to All Star by Adam Ellis, a loan officer employed by Eagle in the Owings Mills Branch, demonstrate that the Eagle Defendants extended the fixed price to Eagle Title.  *See* **Exhibit 24,**  Eagle Title Disclosures.

   C.   **Eagle Borrowers are Injured by the Kickback and Price Fixing Agreements.**

90.   As a result of the Eagle Defendants' performance of the Kickback and Price Fixing Agreements, Eagle borrowers, including Plaintiffs and alleged Class Members, are harmed and suffer concrete injury because they are: (a) defrauded into being charged and paying amounts that are not related to any legitimate title or settlement services and charged to pay for illegal kickbacks; (b) charged and pay higher and unnecessarily increased amounts for title and settlement services than they would have without the Kickback and Price Fixing Agreements; (c) denied kickback free title and settlement services, and (d) denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

**FACTUAL ALLEGATIONS RELATED TO THE**
**INDIVIDUAL CLASS REPRESENTATIVES**

I.   **Plaintiff Wilson's Eagle Loan**

91.   On or about July 2010, Plaintiff Sam Wilson, Jr. ("Wilson") obtains a residential mortgage loan from the Eagle Defendants through Gary Becker, a loan officer the Eagle

26

Defendants employ at the Eagle Forest Hill Branch, in relation to the purchase of residential real property located at 6300 Elmhurst Street, District Heights, MD, 20747. Wilson's Eagle loan closes on or about July 26, 2010.  *See* **Exhibit 16**, All Star 2010 Marketing Tracking Spreadsheet.

92.   Becker assigns and refers the Wilson Eagle loan to All Star as quid pro quo for the kickbacks All Star paid the  Eagle Defendants in May and June 2010, as described in ¶49(j)-(p), thereby performing the Kickback Agreement, depriving Wilson of his choice of title and settlement service provider and denying Wilson kickback-free title and settlement services.  *See* **Exhibit 16**.

93.   The Eagle Defendants and All Star charge Wilson the agreed fixed price of $1,300.00 in total title and settlement service fees, thereby performing the agreement on fixed prices. *See* **Exhibit 16**.

94.   These title and settlement service fees include the $50 Eagle Overcharge and $300 Kickback Overcharge described in ¶71 which is the minimum amount of Wilson's actual damages resulting from the Kickback and Price Fixing Agreements.

95.   All Star disburses proceeds from Wilson's Eagle loan in payment of these title and settlement service charges.

96.   As a direct and proximate result of the Kickback and Price Fixing Agreements, Wilson is harmed because he is: (i) charged and pays fraudulent charges for title and settlement services including amounts that are not related to any legitimate title or settlement service and charged to fund illegal kickbacks; (ii) charged and pays unnecessarily increased and higher title and settlement services fees than he would have paid without the illegal Kickback and Price Fixing Agreements; (iii) stripped of his choice of title and

settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

97.    As a direct and proximate result of the Kickback and Price Fixing Agreements, Wilson suffers actual damages in the amount of at least $350 and, on information and belief, additional amounts.

**II.    Unthank Plaintiffs' Eagle Loan**

98.    On or about July 2010, Plaintiffs John and Jackie Unthank obtain a residential mortgage loan from the Eagle Defendants through the Eagle Bel Air Branch, in relation to the refinance of a loan secured by real property located at 9513 Tottenham Circle, Frederick, MD 21704.  The Unthanks' Eagle loan closes on or about July 23, 2010. *See* **Exhibit 17**, Unthank HUD-1.

99.    The Eagle Bel Air Branch, by and through Eagle loan officer Ryan Rojek, assigns and refers the Unthanks' loan to All Star in performance of the Kickback Agreement and as quid pro quo for the kickbacks All Star paid to the Eagle Defendants in May 2010, laundered through Lendanear and Influence Direct, or in the alternative, the kickbacks All Star paid to Eagle Defendants in June 2010, laundered through Lendanear and Influence Direct, thereby performing the Kickback Agreement, depriving the Unthanks of their choice of title and settlement service provider, and denying the Unthanks kickback-free title and settlement services.  *See also* **Exhibit 18**, July 13, 2010 e-mail re: Unthank loan in pipeline.

100.   All Star charges the Unthanks $2,107.60 in total title and settlement service fees, thereby performing the agreement on fixing prices. *See* Unthank HUD-1, attached as **Exhibit 17**. These fees include an approximately $600 Eagle Overcharge and $300 Kickback Overcharge as described in ¶77 and ¶79 and constitutes the minimum amount of the Unthanks' actual damages proximately caused by the Kickback and Price Fixing Agreements.

101.   All Star disburses proceeds from the Unthanks' Eagle loan in payment of these charges, as reflected on the Unthanks' HUD-1. *See* **Exhibit 17**.

102.   As a direct and proximate result of the Kickback and Price Fixing Agreements, the Unthanks are harmed because they are: (i) charged and pay higher and unnecessarily increased title and settlement services fees than they would have without the illegal Kickback and Price Fixing Agreements; (ii) was defrauded into being charged and paying higher and fixed prices for title and settlements service fees unnecessarily increased by amounts not associated with any legitimate title and settlement service; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

103.   As a direct and proximate result of the Kickback and Price Fixing Agreements, the Unthanks suffer actual damages in the amount of at least $900 and, on information and belief, additional amounts.

104.   Plaintiffs' transactions and the course of events thereafter exemplify the working of the Kickback Agreement, the agreement fixing prices and the All Star Scheme and are typical of all alleged Class Members' transactions.

## FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

105.   Essential to the All Star Scheme, the Eagle Defendants and All Star undertake affirmative acts that fraudulently conceal the Kickback and Price Fixing Agreements, the illegal kickbacks, the related fixed prices and overcharges, and the actual injury and damages to borrowers, including Plaintiffs and alleged Class Members.

**I.    All Star and the Eagle Defendants Launder Kickbacks through Third Party Marketing Companies and create sham invoice and payment records.**

106.   As described in ¶¶23-28, 49, 53, and 57 above, the Eagle Defendants and All Star choose to conceal the fact and payment of kickbacks by All Star to the Eagle Defendants by laundering kickbacks through third party marketing companies such as Influence Direct, Tranzact and Lendanear. Laundering the kickbacks through third party marketing companies conceals the fact that any thing of value is exchanged between All Star and the Eagle Defendants related to the assignment and referral of loans, including Plaintiffs' and Class Members' loans.

107.   For most, if not all, of the kickback payments laundered through a third party marketing company, the Eagle Defendants and All Star cause the third party marketing company to issue a sham invoice to All Star.  These invoices are a sham, and fraudulent, because these invoices falsely portray that All Star is receiving marketing services from the third party marketing company in exchange for the payments. *See* the collection of sham invoices related to the kickbacks paid the Eagle Defendants attached as **Exhibit 19.**

108.   These invoices, and the related payment records, are false because All Star is not receiving any marketing services from the third party marketing company, the payment is a kickback made solely in exchange for the referral of loans, and All Star's payment to third party marketing company is applied for the sole benefit of the Eagle Defendants.

109.   This false record conceals the kickbacks, Kickback Agreement and All Star Scheme from any person who may examine All Star's financial records including auditors, regulators, law enforcement or borrowers.

## II.   The Eagle Defendants and All Star Falsely Allocate Fees and Manipulate the APR.

110.   The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage.  While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus certain other lender fees, such as origination fees, discount points and some closing costs, including some title and settlement service fees.  The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate.  Lenders are required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

111.   The title and settlement service fees that are excluded in the APR calculation are defined by TILA. 12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others are not), title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and

settlement services to those categories of fees that are excluded from the APR calculation.

112.    As a regular and continuing business practice, the Eagle Defendants and All Star allocate the charges for title and settlement services associated with a borrower's loan only to those categories of title services not included in the APR, thereby falsely minimizing the APR reported on Eagle borrowers' loan documents and required federal disclosures.

113.    For example, "fees for title examination, abstract of title, [and] title insurance" are excluded from the APR calculation – *see* 12 C.F.R. § 1026.4(c)(7)(i) – while a settlement or closing fee and an application signing fee are settlement service costs required to be included in the APR calculation. *See* 12 C.F.R. § 1026.4(a)(1)(i). By allocating the charges associated to conducting a settlement or closing with a borrower to the category of "title exam" or "abstract" the result would be a false, and falsely minimized, APR.

114.    All Star claims the false allocation of fees and manipulation of the APR as a regular business practice, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the APR. *See, e.g.*, June 6, 2011 E-mail, attached as **Exhibit 20**; Sept. 24, 2015 E-mail, attached as **Exhibit 21**; October 6, 2015 E-mail, attached as **Exhibit 22**.

115.    The Eagle Defendants participate in and ratify this false allocation of fees. *See* **Exhibit 9;** Sept. 23, 2010 email attached as **Exhibit 23.** Based on this continuing pattern of practice, Plaintiffs believe, and therefore allege, that the Eagle Defendants and All Star

engage in the false allocation and manipulation of the APR throughout the time period the Eagle Defendants is participating in the All Star Scheme.

116. For example, despite conducting a settlement or closing with each Eagle borrower, the Eagle Defendants choose to not allocate any amount of All Star's charges associated with a borrower's loan to "settlement or closing fee" because that charge is included in the APR. Instead, All Star and Eagle Defendants allocate all charges, including that portion attributable to conducting a settlement or closing, to "Title Exam" or "Abstract", which are excluded from the APR. *See, e.g.,* **Exhibit 17,** Unthank HUD-1.

117. Eagle Defendants and All Star's choice to falsely allocate fees results in the fraudulent reporting of false APR's and the false, and falsely minimized, representation of the cost of the loan to Eagle Defendants borrower.

118. The Eagle Defendants, and All Star's choice to falsely allocate fees and fraudulently report these false allocations in borrowers' loan documents concealed from Eagle Defendants borrowers the artificially inflated prices of title and settlement services resulting from the Kickback Agreements and prevented borrowers from discovering the fixed nature of the pricing through comparison to the Eagle Defendants' and All Star's competitors.

119. As a regular business practice, All Star uses various software programs, including "Titlehound", to produce borrower loan documents, including documents reporting the APRs associated with a loan. All Star causes this software, including Titlehound, to be programmed to make these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce the Eagle Defendants' loan documents

to present to borrowers and on which the Eagle Defendants, and All Star intend borrowers rely.

120.     The Eagle Defendants' and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed from Eagle borrowers the coordinated business relationships between All Star and each Eagle Defendant under the Kickback Agreement, the higher prices for title and settlement services resulting from the Kickback and Price Fixing Agreements, and affirmatively prevented the Eagle borrowers from discovering their injuries resulting therefrom.

## III.     False Representations in Eagle Borrowers' Loan Documents.

121.     The Eagle Defendants and All Star also choose to make false representations on borrowers' loan documents.

122.     At all relevant times, federal law required the Eagle Defendants, as lender, to provide a "Good Faith" Estimate to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b). "The required standardized GFE form must be prepared completely and accurately." 12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

123.     Block 4 of the "Good Faith" Estimate is to state only the charges for "title services and lender's title insurance".

124.     As a regular pattern of practice, the Eagle Defendants each falsely include in Block 4 charges that are not title services and lender's title insurance including the Eagle and Kickback Overcharges, which are not associated with any legitimate title or settlement service and are charged for the sole purpose of funding the illegal kickbacks.

125.   The Eagle Defendants' choice to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the illegal kickback; (ii) the fact and amount of the Eagle and Kickback Overcharges; and (iii) the coordinated business relationship between the Eagle Defendants and All Star under the Kickback and Price Fixing Agreements.

126.   In addition, the loan originator must state in Block 1 of the Good Faith Estimate:

> [A]ll charges that loan originators involved in this transaction will receive, except for any charge for the specific interest rate chosen (points).  A loan originator may not separately charge any additional fees for getting this loan, including for application, processing, or underwriting. The amount stated in Block 1 is subject to zero tolerance, *i.e.,* the amount may not increase at settlement.

12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

127.   As a regular pattern of practice, the Eagle Defendants chose to falsely omit reporting the Eagle and Kickback Overcharges in Block 1 of the Good Faith Estimate even though the Eagle and Kickback Overcharges are charges the Eagle Defendants would receive in the transaction.

128.   The Eagle Defendants' choice to falsely omit the Eagle and  Kickback Overcharges from Block 1 of the "Good Faith" Estimate conceals from borrowers: (i) the fact and amount of the Eagle and Kickback Overcharges; (ii) the illegal kickbacks, and (iii) the coordinated business relationship between the  Eagle Defendants and All Star  under the Kickback and Price Fixing Agreements.

129.   In addition to the Good Faith Estimate, federal law, at all relevant times, requires each borrower to receive a HUD-1 Settlement Statement at the closing or settlement of a loan.

The settlement agent produces the HUD-1, but federal regulations require the loan originator to provide to the settlement agent all information appearing in the HUD-1 statement.

130. Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

131. As a continuing pattern and regular business practice, the Eagle Defendants and All Star choose and cause the false allocation of fees described in ¶¶ 110-120 to repeat and appear on Eagle borrowers' HUD-1 statements in Section 1100.

132. As a continuing pattern and regular business practice, the Eagle Defendants omit and fail to describe anywhere on a borrower's HUD-1 statement the amount of the kickback received by the Eagle Defendants related to the borrower's loan or the fact that All Star has paid a kickback to the Eagle Defendants for the assignment and referral of the borrower's loan.  The Eagle Defendants are required to report the kickback on Line 808 of the HUD-1, and perhaps other lines.

133. As a continuing pattern of practice, the Eagle Defendants omit and fail to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any Eagle or Kickback Overcharge or other flat fee associated with the Kickback Agreement and/or the agreement fixing prices.  The Eagle Defendants are required to itemize these amounts in the in Section 1100 or Section 1300 of the HUD-1. Instead, the Eagle Defendants choose to omit any description of the Eagle and Kickback Overcharges from these sections and fraudulently lump the amount of the Eagle and Kickback Overcharges into the amounts associated with legitimate title and settlement

36

services, such as title examination and/or abstract. This is fraudulent because the Eagle and Kickback Overcharges are not associated with any legitimate title and settlement service and charged solely for the purpose of paying for illegal kickbacks.

134.    Lenders authorized to underwrite government insured or guaranteed loans – such as VA or FHA loans -  use charts produced by the Department of Housing and Urban Development ("HUD") listing the Mean, Median, and 80th percentile of settlement services charges by state to measure a "reasonable and customary" settlement service fee per 24 C.F.R. § 203.27.

135.    These authorized lenders require their mortgage broker correspondents, like the Eagle Defendants, to follow these charts.

136.    509 of the 535 loans assigned and referred by the Eagle Defendants to All Star during the time period of the All Star Scheme were VA and FHA loans. The Eagle Defendants were required to certify that the charges on these loans complied with these guidelines per 24 C.F.R. § 203.27 and 24 C.F.R. § 203.255.   This certification is presented to borrowers on the "Direct Endorsement" form.

137.    As a regular business practice, the Eagle Defendants falsely certified borrowers Direct Endorsement forms. These certifications were false because the fees charged borrowers did not comply with HUD regulations because the charges resulting from the  Kickback Agreement and agreement fixing prices are unnecessarily increased by the Eagle and Kickback Overcharges, not reasonable and customary, and included amounts not associated with any legitimate title and settlement service.

138.    These false representations and omissions, presented to  Eagle  borrowers by All Star – as the Eagle Defendant's agent – at closing, fraudulently conceal: (i) the illegal

kickbacks; (ii) the fact and amount of the Eagle and Kickback Overcharges and the fact that borrowers are being charged an amount not associated with a legitimate title and settlement service; (iii) the coordinated business relationship between the Eagle Defendants and  All Star under the Kickback and Price Fixing Agreements.

IV.   **Plaintiffs' Reasonable Diligence**

139.   As a result of the fraudulent concealments by the Eagle Defendants, the Eagle Defendants, and All Star, Wilson and the Unthanks (and all members of the alleged Class) had no actual notice before, at or after the closing of their Eagle  loans of the illegal kickbacks, the exchange of any thing of value between the Eagle Defendants and All Star related to their Eagle loan, the resulting Eagle and Kickback Overcharges, or the coordinated business relationship of the Eagle Defendants and All Star under the Kickback and Price Fixing Agreements.

140.   Plaintiffs exercised reasonable diligence before, during and after the closing of their loans.

**A.  Plaintiff Wilson's Reasonable Diligence.**

141.   Plaintiff Wilson receives loan documents prepared by the Eagle Defendants in advance of his closing and reviews those loan documents.

142.   Plaintiff Wilson believes, and therefore avers, that his pre-closing loan documents include a "Good Faith" Estimate prepared by the Eagle Defendants.

143.   The Eagle Defendants choose to omit from his "Good Faith" Estimate any description or statement of the coordinated business relationship between the Eagle Defendants and All Star and to include the fraudulent representations and omissions described in ¶¶122-128.

Plaintiff Wilson believes and therefore avers that his "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to his refinance.

144.   The Eagle Defendants choose to include in his pre-closing documents the false allocation of fees and a false APR as described in ¶¶ 110-120.  Plaintiff Wilson's belief is supported by the allocation of fees in his HUD-1, which is consistent with the Eagle Defendants' and All Star's pattern of false allocation of fees and false statement of the APR.

145.   The Eagle Defendants make the false statements and omissions in Plaintiff Wilson's pre-closing loan documents for the purposes of concealing, and did so conceal from Plaintiff Wilson, the coordinated business relationship between the Eagle Defendants and All Star, the Kickback Agreement, the fact, nature and amount of the illegal kickbacks related to Plaintiff Wilson's loan, the agreement fixing prices and the fixed nature of prices charged Plaintiff Wilson for title and settlement services.

146.   As is reasonable under the circumstances, Plaintiff Wilson believed these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Wilson did not believe, that: (i) a coordinated business relationship exists between the Eagle Defendants and All Star; (ii) there has been any payment or exchange of a thing of value between the Eagle Defendants  and All Star related to the assignment and referral of Plaintiff Wilson's loan for title and settlement services; or (iii) the prices he will be charged for title and settlement services are the result of Kickback and/or Price Fixing Agreements.

147.  Plaintiff Wilson acted diligently during the closing or settlement of his loan.  As a condition of funding his loan, the Eagle Defendants require Plaintiff Wilson to participate in a closing, and he attends and fully participates in the required closing.

148.  At the closing of his loan, Plaintiff Wilson received from All Star, or its agent, all of the loan documents required by the Eagle Defendants to close his loan, including a HUD-1.

149.  Plaintiff Wilson believes, and therefore avers, that Eagle Defendants and All Star choose to omit from the documents Plaintiff Wilson receives at closing, including his HUD-1, any description or statement of the coordinated business relationship between the Eagle Defendants and All Star under the Kickback and/or Price Fixing Agreements.

150.  The Eagle Defendants and All Star chose to omit from the documents Plaintiff Wilson received at closing, including his HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to the Eagle Defendants, or received by the Eagle Defendants from All Star, related to Plaintiff Wilson's loan.

151.  The Eagle Defendants and All Star chose to include in the documents Plaintiff Wilson received at closing, including his HUD-1, the false allocation of fees as described in ¶¶ 110-120 and the resulting fraudulent representations and omissions as described in ¶¶ 129-133.

152.  The Eagle Defendants chose to include in the documents Plaintiff Wilson received at closing the false certification described in ¶¶ 134-138.

153.  The Eagle Defendants and All Star make the fraudulent omissions and representations and false certifications in Plaintiff Wilson's loan closing documents for the purposes of concealing, and did so conceal from Plaintiff Wilson, the coordinated business relationship between the Eagle Defendants and All Star, the Kickback Agreement, the

fact, nature, and amount of the illegal kickback related to Plaintiff Wilson's loan, the agreement fixing prices, the Eagle and Kickback Overcharges, and Plaintiff Wilson's injuries and actual damages therefrom.

154.   As is reasonable under the circumstances, Plaintiff Wilson believed these closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Wilson did not believe, that: (i) a coordinated business relationship exists between the Eagle Defendants and All Star; (ii) there has been any payment or exchange of a thing of value between the Eagle Defendants and All Star related to the assignment and referral of Plaintiff Wilson's loan for title and settlement services; (iii) include the Eagle and  Kickback Overcharges or any other amount not associated with any legitimate title and settlement service; or (iv) the prices charged for title and settlement services are fixed and the result of Kickback and Price Fixing Agreements between the Eagle Defendants and All Star.

155.   Plaintiff Wilson acted diligently after his closing. On or about June 4, 2019, Plaintiff Wilson received a letter from undersigned counsel describing an investigation of the Eagle Defendants and All Star.  This is Plaintiff Wilson's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

156.   Within days, Plaintiff Wilson contacts and retains counsel. Plaintiff Wilson files this Complaint within a year of becoming aware of facts giving rise to his causes of action.

**B.  The Unthank Plaintiffs' reasonable diligence.**

157.   The Unthanks receive loan documents prepared by the Eagle Defendants in advance of their closing and review those loan documents.

41

158.   The Unthanks believe, and therefore aver, that their pre-closing loan documents include a "Good Faith" Estimate prepared by the Eagle Defendants.

159.   The Eagle Defendants choose to omit from the Unthanks' "Good Faith" Estimate any description or statement of the coordinated business relationship between the Eagle Defendants and All Star and to include the fraudulent representations and omissions described in ¶¶ 122-128.  The Unthanks believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to their refinance.

160.   The Eagle Defendants choose to include in their pre-closing documents the Eagle Defendants and All Star's false allocation of fees and a false APR as described in ¶¶110-120. The Unthanks' belief as to the allocation of fees reflected on the "Good Faith" Estimate is supported by the allocation of fees on the Unthanks' HUD-1, which is consistent with All Star and the Eagle Defendants' pattern of false allocation of fees and resulting false APR.  *See* Unthanks' HUD-1, **Exhibit 17.**

161.   The Eagle Defendants make the false statements and omissions in the Unthanks' pre-closing loan documents for the purposes of concealing, and did so conceal from the Unthank Plaintiffs,  the coordinated business relationship between the Eagle Defendants and All Star, the Kickback Agreement, the fact, nature and amount of the illegal kickbacks related to the Unthank Plaintiff s' loan, the agreement fixing prices and the fixed nature of prices charged the Unthank Plaintiffs for title and settlement services.

162.   As is reasonable under the circumstances, the Unthank Plaintiffs believed these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Unthank Plaintiffs did not believe, that: (i) a

coordinated business relationship exists between the Eagle Defendants and All Star; (ii) there has been any payment or exchange of a thing of value between the Eagle Defendants and All Star related to the assignment and referral of the Unthank Plaintiffs' loan for title and settlement services; or (iii) the prices he will be charged for title and settlement services are the result of Kickback and/or Price Fixing Agreements between the Eagle Defendants and All Star.

163.    The Unthanks acted diligently during the closing or settlement of their loan.  As a condition of funding their loan, the Eagle Defendants require the Unthanks to participate in a closing, and the Unthanks attend and fully participate in the required closing and review all documents with All Star's representative.

164.    At the closing of their loan, the Unthanks received from All Star, or its agent, all of the loan documents required by the Eagle Defendants to close the Unthanks' Eagle loan, including a HUD-1. The Unthanks reviewed and signed all of the documents All Star presents at the closing, including the HUD-1.

165.    The Eagle Defendants and All Star chose to omit from the documents the Unthanks receive at closing, including their HUD-1, any description or statement of the coordinated business relationship between the Eagle Defendants and All Star under the Kickback Agreement and/or agreement fixing prices.  *See* **Exhibit 17**.

166.    The Eagle Defendants and All Star choose to omit from the documents the Unthanks receive at closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to the Eagle Defendants, or received by the Eagle Defendants from All Star, related to the Unthanks' Eagle loan. *See* **Exhibit 17**.

43

167.    The Eagle Defendants and All Star choose to include in the documents the Unthanks receive at closing, including their HUD-1, the false allocation of fees as described in ¶¶ 110-120 and the resulting fraudulent representations and omissions as described in ¶¶ 129-133.

168.    The Eagle Defendants choose to include in the Unthank loan documents presented at closing the false certification described in ¶¶134-138.

169.    The Eagle Defendants and All Star make the fraudulent omissions and representations and false certifications in the Unthanks' loan closing documents for the purposes of concealing, and did so conceal from the Unthank Plaintiffs, the coordinated business relationship between the Eagle Defendants and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickback related to the Unthanks' loan, the fixed nature of the prices charged for title and settlement services, and the Unthanks' injuries and actual damages therefrom.

170.    As is reasonable under the circumstances, the Unthanks believed these closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Unthanks do not believe, that: (i) a coordinated business relationship exists between the Eagle Defendants and All Star; (ii) there has been any payment or exchange of a thing of value between the Eagle Defendants and All Star related to the assignment and referral of the Unthanks' Eagle loan for title and settlement services; (iii) include the Eagle and Kickback Overcharges or any other amount not associated with any legitimate title and settlement service; or (iv) the prices charged for title and settlement services are fixed and the result of Kickback and Price Fixing Agreements between the Eagle Defendants and All Star.

44

171. The Unthanks acted diligently after their closing. On or about May 31, 2019, the Unthanks received a letter from undersigned counsel describing an investigation of All Star and the Eagle Defendants.  This is the Unthanks' first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

172. Within days, the Unthanks contact and retain counsel.  The Unthanks file this Complaint within a year of becoming aware of facts giving rise to their causes of action.

## V.     Accrual and Tolling of Limitations

173. The limitations period provided in 15 U.S.C. §15(b) is subject to the discovery of injury rule.  *Detrick v. Panalpina,* 108 F.3d 529 (4th Cir. 1997) *cert. denied* 1997 U.S. LEXIS 4626.  The Eagle Defendant's affirmative and fraudulent acts precluded Eagle borrowers, including Plaintiffs and Class Members, from discovering their actual damages and injuries caused by the Price Fixing Agreements between the Eagle Defendants and All Star.

174. As a result, Plaintiffs', and Class Members', claims pursuant to the Sherman Act did not accrue, for the purpose of the limitations period provided in 15 U.S.C. § 15(b), until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury – for Wilson, on or about June 4, 2019, and for the Unthanks, on or about May 31, 2019.

175. In addition and in the alternative, as a result of the Eagle Defendants' and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during and after the closing of Plaintiffs' loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of each Plaintiffs' loan closing and continuing until the learning of facts giving rise to the causes of action pled herein: for Wilson, on or about June 4, 2019, and for the Unthanks, on or about May 31, 2019.

176.   Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback and Price Fixing Agreements and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to fraudulent concealment tolling of applicable limitations period.

### COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA),
### 12 U.S.C. § 2607(a)

177.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

178.   All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

179.   The Eagle Defendants, by and through their brokers, loan officers, employees and/or agents, received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

180.   All loans referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by the Eagle Defendants and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

181.   The payment and/or arranging of payment of kickbacks to the Eagle Defendants by All Star and the Eagle Defendants' receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

46

182.   The payments from All Star to the Eagle Defendants were not associated with any goods, facility or service actually provided by the Eagle Defendants, or any of its agents and/or employees, to All Star, and in addition or in the alternative, the value of any good, facility or service provided claimed to be provided by the Eagle Defendants to All Star is not reasonably related to the payment from All Star such that the payment is not "bona fide" or within the protection of 12 U.S.C. §2607(c)(2).

183.   In addition, All Star's laundering of money through the third party marketing companies was always solely expressly payments to the Eagle Defendants for the assignment and referral of Eagle loans and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star.

184.   In the alternative, any payment made by All Star to the Eagle Defendants and/or laundered through any third party marketing company is far greater, and not reasonably related, to All Star's nominal presence in the solicitations and were in reality simply kickbacks designed to look like legitimate payments.

185.   As successor in interest to the Eagle Defendants, ESSA is liable for the Eagle Defendants RESPA violations pled herein under the express terms of and law controlling  the Merger described in ¶¶ 11 -13  and general successor liability principles.

186.   Plaintiffs allege claims for violations of 12 U.S.C. §2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Eagle National Bank or Eagle Nationwide Mortgage Company for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2009, and December 31, 2011.  Exempted from this class is any person who, during the period of January 1, 2009

through December 31, 2011, was an employee, officer, member and/or agent of Defendants Eagle National Bank, Eagle Nationwide Mortgage Company, Eagle National Bancorp. Inc., ESSA Bank & Trust, Inc., ESSA Bancorp Inc., or All Star Title, Inc.

(the "RESPA Class").

187.   There are questions of law and fact common to the claims of each and all members of the RESPA Class.  These common questions include, but are not limited to:

a.   Whether there existed a referral agreement between the Eagle Defendants and All Star whereby the Eagle Defendants agreed to assign and refer Eagle loans, refinances and reverse mortgages to All Star in return for kickbacks;

b.   Whether the Eagle Defendants and its employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c.   Whether the illegal kickbacks to the Eagle Defendants and its employees and/or agents violated RESPA;

d.   Whether the Eagle Defendants and All Star used third party marketing companies to launder kickbacks related to Eagle loans;

e.   Whether Plaintiffs and RESPA Class Members were forced to pay higher and unnecessarily increased charges for settlement services;

f.   Whether the Eagle Defendants used sham invoices and payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

g.   Whether the Eagle Defendants disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between the Eagle Defendants and All Star related to any borrower's loan;

48

h.   Whether the Eagle Defendants disclosed or described on any borrowers "Good Faith" Estimate, HUD-1 or other loan document the Eagle Defendants' coordinated business relationship with All Star or the fact that a thing of value had been exchanged between the Eagle Defendants and All Star related to any borrower's loan;

i.   Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel.

j.   Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

k.   Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

188.   These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

189.   Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

190.   Plaintiffs will fairly and adequately protect the interests of the RESPA Class. The Plaintiffs' interests and the interests of all other members of the RESPA Class are identical.

191.   Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S.

District Courts in similar litigation, and will adequately represent the RESPA Class' interests.

192. The RESPA Class consists of borrowers on more than 500 loans, and thus are so numerous that joinder of all members is impracticable.

193. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendants.

194. This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

195. Most members of the RESPA Class are unaware of their rights to prosecute a claim against the Eagle Defendants and/or its successor in interest, ESSA.

196. No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## COUNT II
### Violation of the Sherman Act,
### 15 U.S.C. § 1

197. Plaintiffs incorporate the above stated paragraphs as if restated herein.

198. All Star and the Eagle Defendants  conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1.

199. During the relevant time period, the Eagle Defendants operated, maintained an ownership interest in and/or controlled Eagle Title.

200. Eagle Title functioned as the Eagle Defendants' internal title company and the Eagle Defendants extended their price fixing agreements with All Star to the prices charged for similar title and settlement services by Eagle Title.

201. The fixed prices agreed to and charged by the Eagle Defendants and  All Star pursuant to the Price Fixing Agreements are an unreasonable restraint of trade because: (1) the Eagle Defendants and All Star were direct competitors in the title and settlement services market and price fixing agreements between competitors at the same market level are unreasonable restraints of trade as a matter of law and *per se* violations § 1 of the Sherman Act, and (2) pursuant to 12 U.S.C. § 2601 and 12 U.S.C. § 2607(a), price fixing for the purpose of facilitating illegal kickbacks between residential mortgage lenders and title and settlement service companies are among those class of price-fixing agreements that are for an anti-competitive purpose, plainly harmful to competition and so obviously lacking in any redeeming procompetitive value as to be conclusively presumed an unreasonable restraint of trade.

202. As a direct and proximate result of the price fixing agreement between the Eagle Defendants and All Star, Plaintiffs and Class Members were charged and paid higher and unnecessarily increased prices for title and settlement services and were charged and paid more for title and settlement services than they otherwise would have without the price fixing agreements, and were charged and paid amounts not associated with any legitimate title and/or settlement service.

203.   As a direct and proximate result of the price fixing agreements between the Eagle Defendants and All Star, Plaintiffs were injured and suffered actual damages in the amount of at least $300.

204.   As successor in interest to the Eagle Defendants, ESSA is liable for the Eagle Defendants' Sherman Act violations pled herein under the express terms of and law controlling the Merger identified in ¶¶ 11-13, as well as general successor liability principles.

205.   Plaintiffs allege claims pursuant to Fed. R. Civ. P. 23 for violations of 15 U.S.C. § 1 ("Anti-Trust Class"), with the alleged Anti-Trust Class defined as:

> All individuals in the United States who were borrowers on a loan originated or brokered by Eagle National Bank or Eagle Nationwide Mortgage Company for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2009, and December 31, 2011.  Exempted from this class is any person who, during the period of January 1, 2009 through December 31, 2011, was an employee, officer, member and/or agent of Defendants Eagle National Bank, Eagle Nationwide Mortgage Company, Eagle National Bancorp Inc., ESSA Bank & Trust, Inc., ESSA Bancorp Inc., or All Star Title, Inc.

206.   The Anti-Trust Class consists of borrowers on more than 500 loans, and thus are so numerous that joinder of all members is impracticable.

207.   There are questions of law and fact common to the claims of each and all members of the Anti-Trust Class.  These common questions include, but are not limited to:

a.   Whether the Eagle Defendants and its employees and/or agents violated the Sherman Act by conspiring to and fixing the title and settlement services fees charged to and paid by Plaintiffs and Anti-Trust Class Members;

b.  Whether the price fixing agreements between the Eagle Defendants and All Star are *per se* violations of the Sherman Act;

c.  Whether the prices charged Eagle borrowers pursuant to the price fixing agreements included the Eagle and Kickback Overcharges and were higher than prices that would have been charged without the price fixing agreements;

d.  Whether the Eagle Defendants' made false representations to borrowers to actively conceal the price fixing agreements, fixed prices and Eagle and Kickback Overcharges resulting therefrom;

e.  Whether the Eagle Defendants and All Star falsely allocated fees and otherwise manipulated APR calculation on Class Members' loans to actively conceal the price fixing agreements and fixed prices and Eagle and Kickback Overcharges charged Eagle borrowers in performance of those agreements;

f.  Whether the Eagle Defendants and All Star made false representations on Eagle borrowers Good Faith Estimates, HUD-1 and other loan documents to actively conceal the price fixing agreements, the fixed prices and Eagle and Kickback Overcharges charged Eagle borrowers in performance of those agreements;

g.  Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the price fixing agreements, fixed prices and Eagle and Kickback Overcharges, and their injuries and actual damages therefrom, until contacted by counsel;

h.  Whether Plaintiffs and the Anti-Trust Class are entitled to treble damages under the Sherman Act; and

      i.   Whether Plaintiffs and the Anti-Trust Class are entitled to attorneys' fees and expenses under the Sherman Act.

208.    These common issues of law and fact predominate over any question affecting only individual Anti-Trust Class Members.

209.    Plaintiffs' transaction and claims are typical of the claims or defenses of the respective Anti-Trust Class Members and are subject to the same statutory measure of damages set forth in 15 U.S.C. § 15(a).

210.    Plaintiffs will fairly and adequately protect the interests of the Anti-Trust Class. The interests of the named Plaintiffs and all other members of the Anti-Trust Class are identical.

211.    Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the Anti-Trust Class's interests.

212.    Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendants.

213.    This action entails questions of law and fact common to Anti-Trust Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

214.    Most members of the Anti-Trust Class are unaware of their rights to prosecute a claim against the Eagle Defendants and/or its successor in interest, ESSA.

215.     No member of the Anti-Trust Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**WHEREFORE**, Plaintiffs respectfully demand:

a.   This Court certify the RESPA and Anti-Trust Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

b.   Judgment for Plaintiffs and RESPA Class Members against ESSA Bancorp, Inc. and ESSA Bank & Trust, as successors in interest to Eagle National Bank, Eagle Nationwide Mortgage Company and Eagle National Bancorp, Inc., and award Plaintiffs and RESPA Class Members an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c.   Demand judgment for Plaintiffs and Anti-Trust Class Members against ESSA Bancorp, Inc. and ESSA Bank & Trust, as successors in interest to Eagle National Bank, Eagle Nationwide Mortgage Company and Eagle National Bancorp, Inc., and award Plaintiffs and Anti-Trust Class Members damages in the amount equal to three times the actual damages caused by the agreement fixing prices pursuant to 15 U.S.C. § 15(a);

d.   Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5) and/or 15 U.S.C. § 15(a); and

e.   For such other and further relief as this Court deems proper.

[SIGNATURES ON THE FOLLOWING PAGE]

Respectfully submitted,

_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381          Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679          Melissa L. English, Esq. #19864
Joseph, Greenwald & Laake, P.A.          Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400                 600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770                Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)    (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com               Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                       menglish@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*   *Counsel for Plaintiffs and Class Members*

## PRAYER FOR JURY TRIAL

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Amended

Class Action Complaint.

_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381          Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679          Melissa L. English, Esq. #19864
Joseph, Greenwald & Laake, P.A.          Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400                 600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770                Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)    (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com               Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                       menglish@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*   *Counsel for Plaintiffs and Class Members*