UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

SAM WILSON, JR.,
JOHN UNTHANK and
JACKIE UNTHANK,

    Plaintiffs,

    v.

EAGLE NATIONAL BANK,
EAGLE NATIONWIDE MORTGAGE
COMPANY,
EAGLE NATIONAL BANCORP, INC.,
ESSA BANCORP, INC. and
ESSA BANK & TRUST,

    Defendants.

Civil Action No. TDC-20-1344

**MEMORANDUM OPINION**

Plaintiffs Sam Wilson, Jr., John Unthank, and Jackie Unthank have filed a civil action against Eagle National Bank, Eagle Nationwide Mortgage Company, Eagle National Bancorp, Inc., Essa Bancorp, Inc., and Essa Bank & Trust, in which they allege violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2607-10 (2018), and the Sherman Act, 15 U.S.C. §§ 1-7 (2018). Pending before the Court is Defendants' Motion to Dismiss Count II of the Amended Complaint. For the reasons set forth below, the Motion will be DENIED.

**BACKGROUND**

All Star Title, Inc. ("All Star") was a Maryland-based title and settlement service company which paid kickbacks to participating lenders in exchange for those lenders referring mortgage borrowers to All Star for its services. When a participating lender referred a borrower to All Star pursuant to this scheme, All Star overcharged the borrower and transmitted the kickback to a third-

party marketing company, under the guise of paying a marketing fee owed by All Star, but the third-party marketing company applied All Star's payment toward services that benefited the lender. Often, the scheme entailed sham "co-marketing," under which All Star paid a fee for marketing that would ostensibly promote the services of both All Star and the lender, but the focus and benefit of the marketing actually went to the lender only. Am. Compl. ¶¶ 32-38, ECF No. 33.

Eagle National Bancorp, Inc. was a holding company that owned Eagle National Bank ("Eagle Bank"), which in turn wholly owned Eagle Nationwide Mortgage Company, a lender providing consumer mortgages. Plaintiffs allege that these three entities (collectively, "the Eagle Defendants") operated Eagle Nationwide Title Agency ("Eagle Title"), also known as Eagle Nationwide Abstract Company, which functioned as their "internal title company." *Id.* ¶ 84. In a 2015 merger, ESSA Bancorp, Inc. acquired Eagle National Bancorp, Inc.

Plaintiffs allege that the Eagle Defendants joined All Star's scheme in 2009 and that kickbacks were regularly laundered through sham marketers and received by three Eagle Bank branches located in Forest Hill, Bel Air, and Owings Mills, Maryland. According to Plaintiffs, each of these branches agreed to pay All Star a fixed price for title services which exceeded the price that All Star charged borrowers referred by other lenders. Plaintiffs further allege that the Eagle Defendants "extend[ed]" these fixed prices "to the prices charged by Eagle Title" and listed Eagle Title's price on the Written List of Settlement Service Providers provided with the Good Faith Estimate given to their borrowers. *Id.* ¶ 88. Specifically, these written estimates stated that Eagle Title's price for its title services and title insurance would be $2,000 for borrowers at the Owings Mills branch—the exact price that All Star and the Eagle Defendants agreed that All Star would charge borrowers referred by that branch.

Plaintiffs' Amended Complaint contains two counts. Count I, which is not a subject of the Motion, asserts that by participating in this scheme, the Eagle Defendants violated various provisions of RESPA. Count II asserts that the Eagle Defendants are liable for horizontal price fixing, a *per se* violation of the Sherman Act.

## DISCUSSION

In their Motion, Defendants seek dismissal of Count II on the grounds that the Eagle Defendants were not direct competitors of All Star and therefore cannot be liable for participating in a horizontal price-fixing conspiracy. Defendants further argue that Plaintiffs have not alleged sufficient facts to state a plausible claim of a price-fixing agreement between All Star and Eagle Title. Plaintiffs oppose the Motion.

### I.     Legal Standards

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). On a Rule 12(b)(6) motion, documents attached to the complaint or motion may be considered if "they are integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

3

**II.     Sherman Act**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1.  To establish a violation of § 1, a plaintiff must prove "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).

For the first element, a plaintiff must demonstrate "concerted activity" "in which multiple parties join their resources, rights or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing choices." *Va. Vermiculite, Ltd. v. Historic Green Springs, Inc.,* 307 F.3d 277, 281-82 (4th Cir. 2002); *see Estate Const. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 220 (4th Cir. 1994) ("There must be at least two persons acting in concert.").  This element requires "direct or circumstantial evidence that reasonably tends to prove that" the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)).  The "anticompetitive conduct" must stem "from an agreement, tacit or express." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007).  Thus, there must be "something more" than mere parallel action by the alleged conspirators, and a plaintiff has the burden to "present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.*, 878 F.2d 801, 805-06 (4th Cir. 1989) (citations omitted).  Agreements that occur between "competitors at the same level of the market structure" are termed "horizontal," while agreements

between "persons at different levels of the market structure" are "termed vertical." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 608 (1972).

For the second element, an unreasonable restraint on trade, the mode of analysis depends on the type of restraint imposed: (1) "*per se* analysis" applies to "obviously anticompetitive restraints," while (2) "quick-look analysis" applies to those "with some procompetitive justification," and (3) "rule of reason" analysis applies to "restraints whose net impact on competition is particularly difficult to determine." *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 509 (4th Cir. 2002). Because Plaintiffs assert only a *per se* price-fixing theory, the Court need not address quick-look or rule of reason analysis.

Restraints of trade that are *per se* unlawful include those that can be deemed to have "predictable and pernicious anticompetitive effect" with "limited potential for procompetitive benefit," without any need for "detailed study of the markets" "or the actual effect of those restraints on competition." *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "The critical analysis in determining whether a particular activity constitutes a per se violation is whether the activity on its face seems to be such that it would always or almost always restrict competition and decrease output instead of being designed to increase economic efficiency and make the market more rather than less competitive." *Nat'l Elec. Contractors Ass'n, Inc. v. Nat'l Constructors Ass'n*, 678 F.2d 492, 500 (4th Cir. 1982). Horizontal price fixing is a restraint on trade that is "illegal per se." *Id.*; *see United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (U.S. 1940) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.").

### III.     Horizontal Price-Fixing Conspiracy

Plaintiffs have adequately alleged a horizontal price-fixing conspiracy between All Star and Eagle Title, a *per se* violation of § 1 of the Sherman Act. There can be no serious dispute that Plaintiffs have adequately alleged a price-fixing conspiracy. Specifically, Plaintiffs allege that the Eagle Defendants plotted with All Star to conduct the pricing and kickback scheme outlined in the Amended Complaint. Plaintiffs detail a complicated scheme in which the Eagle Bank branches directed borrowers to All Star for title and settlement services, All Star overcharged the borrowers, and All Star paid kickbacks to the Eagle Bank branch, which were concealed through the use of sham marketing invoices under the guise of co-marketing. Plaintiffs allege numerous, specific kickbacks that were laundered through specific sham marketers and received by Eagle Bank's Forest Hill, Bel Air, and Owings Mills branches. Significantly, they allege that each of these branches agreed to a fixed price that All Star would charge, which exceeded the price that All Star charged to borrowers referred by other lenders.

Defendants argue that even if there was a price-fixing conspiracy, it did not qualify as a *per se* restraint of trade because it was not a horizontal price-fixing conspiracy consisting of an agreement between competitors at the same level of the market structure. In particular, they argue that the Eagle Defendants were not direct competitors with All Star in the market for title and settlement services. Plaintiffs, however, have alleged facts that support a reasonable inference that the scheme included a price-fixing agreement between All Star and Eagle Title, which is undisputedly a direct competitor to All Star in the market for title and settlement services. First, Plaintiffs allege that, in August 2010, All Star and the Eagle Defendants agreed to fix prices for title services and insurance at $2,000 for borrowers referred by the Owings Mills branch to All Star. This allegation is supported by an email exchange in which an Owings Mills branch

employee solicited help from All Star for a "very mutually beneficial marketing" campaign and an All Star employee responded that for "any kind of co-marketing we set our fees at $2,000." Compl. Ex. 15 at 2, 5, ECF No. 1-16.  The fixed price with the Owings Mills branch resulted in an alleged overcharge of $150 to $700 more than what All Star charged for "loans assigned and referred by other lenders" and a "minimum $300" kickback to the branch.  Am. Compl. ¶ 81.  Second, Plaintiffs also allege that, beginning in August 2010, Eagle Title began applying this fixed price itself.  This allegation is supported by statements made on the Written List of Settlement Service Providers given to borrowers as part of the Good Faith Estimate of settlement charges required by law, in use at least from August 2010 to October 2010, informing borrowers that the "estimated fee" from "Eagle Nationwide Title Agency" for title services and title insurance was $2,000.  Am. Compl. Ex. 24 at 1, 16, ECF No. 33-1.

Where Eagle Bank reported this estimated fee as part of the provision of a Good Faith Estimate, it is reasonable to infer that it originated from the identified company, Eagle Title, and that it actually represented the price Eagle Title would charge a borrower for its services.  In turn, based on the allegation that the $2,000 price charged by All Star and estimated by Eagle Title significantly exceeded what All Star charged borrowers referred by other lenders, it is reasonable to infer that Eagle Title would not have provided such estimates that were not competitive with other title servicing options absent an agreement to fix prices with All Star.

To the extent that Defendants may nevertheless argue that the fact that Eagle Title and All Star both charged the same, above-market price is merely a coincidence or an example of a parallel business activity, Plaintiffs allege "something more."  *Parkway Gallery Furniture, Inc.*, 878 F.2d at 806.  Specifically, they allege that the Eagle Defendants "operate[d]" Eagle Title as "their own" "internal title company."  Am. Compl. ¶ 84.  Indeed, the Affiliated Business Disclosure Statement

7

provided by Eagle Bank to borrowers specifically acknowledged that "there is a business relationship between each of the Eagle National Bancorp, Inc. owned entities: Eagle National Bank, Eagle Nationwide Mortgage Company and Eagle Nationwide Abstract Company (doing business in some states as Eagle Nationwide Title Agency)," and that "referrals" for title and settlement services "may result in a financial or other benefit" to the Eagle Defendants or Eagle Title. Am. Compl. Ex. 24 at 3. Notably, Eagle Title is the only company listed on the Written List of Settlement Service Providers given by Eagle Bank to borrowers. When the Eagle Defendants' direct participation in the kickback scheme with All Star is combined with the close affiliation between the Eagle Defendants and Eagle Title, it is reasonable to infer that the common pricing between Eagle Title and All Star was not merely coincidental, but the product of a conspiratorial agreement involving both Eagle Title and All Star.

This conclusion is consistent with the case law, discussed by the parties, in which similar Sherman Act claims involving All Star were asserted. Unlike in *Somerville v. W. Town Bank & Trust*, No. 19-0490, 2019 WL 6131288 (D. Md. Nov. 11, 2019), Plaintiffs have identified a direct competitor, Eagle Title, which they allege was part of the price-fixing scheme. *See id.* at *7-8 (finding no *per se* illegal price-fixing scheme where the plaintiffs had not alleged a conspiracy between any direct competitors). Although Plaintiffs have not identified a specific communication between a bank defendant and All Star discussing a possible quote from the bank's in-house title company, as was present in *Kadow v. First Fed. Bank*, No. 19-0566, 2020 WL 5230560 (D. Md. Sept. 2, 2020), the documentation of a cost estimate from Eagle Title in a legally required disclosure form supports the same conclusion: that the respective title companies directly or indirectly shared pricing information and reached an agreement on their prices. *See id.* at *7;

*Monsanto Co.*, 465 U.S. at 764 (stating that a plaintiff may prove an antitrust conspiracy with "direct or circumstantial evidence").

The fact that the Eagle Defendants, who were not themselves direct competitors with All Star, may have participated in, and even had a significant role in the execution of, the horizontal price-fixing conspiracy, provides a basis for holding them liable under the Sherman Act.  Indeed, courts have identified and imposed liability for Sherman Act horizontal price-fixing conspiracies on entities that orchestrated the conspiracies but were not direct competitors, provided that there were at least two direct competitors who agreed with each other on the price-fixing.  *See United States v. Apple, Inc.*, 791 F.3d 290, 325 (2d Cir. 2015) (holding the defendant Apple, Inc. liable for a *per se* restraint on trade where it organized a price fixing scheme among book publishers that were direct horizontal competitors, even though the defendant itself was not a direct competitor and its relationship to each publisher was vertical); *United States v. Green*, 592 F.3d 1057, 1069 (9th Cir. 2010) (affirming the defendant's *per se* liability as "within the heart of anticompetitive conduct prohibited by the Sherman Act" where the defendant organized vendors, who were potential or actual horizontal competitors, to rig their bids in government contracts despite the fact that the defendant herself was only a consultant and could not compete with the vendors); *see also United States v. MMR Corp.*, 907 F.2d 489, 498 (5th Cir. 1990) ("[A] noncompetitor can join a Sherman Act bid-rigging conspiracy among competitors.  If there is a horizontal agreement between A and B, there is no reason why others joining that conspiracy must be competitors."); *cf. Dickson v. Microsoft Corporation*, 309 F.3d 193, 204 (4th Cir. 2002) (finding no horizontal conspiracy under § 1 of the Sherman Act where Microsoft had separate vertical agreements with original equipment manufacturers, but there was no horizontal agreement between the manufacturers).

9

In summary, Plaintiffs have made three core allegations: that the Eagle Defendants conducted an extensive, ongoing scheme with All Star to fix prices for title services; that Eagle Title provided price estimates identical to All Star's actual prices in the scheme; and that the Eagle Defendants had an ongoing business relationship with Eagle Title as their in-house title company. Construed in the light most favorable to the non-moving party, these three allegations support the inference that there was a price-fixing agreement between direct competitors, All Star and Eagle Title, which is *per se* illegal under § 1 of the Sherman Act. Where Plaintiffs' allegations support liability for the Eagle Defendants as co-conspirators under a well-established *per se* illegality theory, the Court need not consider Plaintiffs' theory of intercorporate unity advanced in their memorandum of law in opposition to the Motion.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Count II of the Amended Complaint will be DENIED. A separate Order shall issue.

Date:  April 2, 2021                      /s/ *Theodore D. Chuang*
                                          THEODORE D. CHUANG
                                          United States District Judge