# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

SAM WILSON, JR., *et al.*,

    *Plaintiffs*,

    v.

EAGLE NATIONAL BANK, *et al.*,

    *Defendants*.

        Case No. 8:20-cv-01344-JRR

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiffs Sam Wilson, Jr., and John and Jackie Unthank, on behalf of themselves and the entire class of persons similarly situated, sued Defendants Eagle National Bank, Eagle Nationwide Mortgage Company, Eagle National Bancorp., Inc., (collectively the "Eagle Defendants") ESSA Bancorp Inc., and ESSA Bank and Trust's (collectively the "ESSA Defendants") (together with the Eagle Defendants, "Defendants") alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607 (a); and the Sherman Act, 15 U.S.C. § 1. Plaintiffs move to certify classes under Federal Rule of Civil Procedure 23(b)(3). (ECF Nos. 112, 112-1; Motion for Class Certification and Memorandum in support thereof; together, the "Motion.")[1] The court has reviewed all filings and attached exhibits. No hearing is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, Plaintiffs' Motion will be granted.

---

[1] The Motion has been fully briefed. *See* the Motion at ECF No. 112; the Response at ECF Nos. 127 (sealed), 128 (redacted); and the Reply at ECF Nos. 131 (redacted), 132 (sealed). In addition to the written briefing, a hearing was held on September 7, 2022, to resolve Defendants' Motion to Strike the opinions of Plaintiffs' Expert William Watkins ECF No. 98 as to class certification. The court granted in part and denied in part the Motion to Strike. (ECF No. 124.) The Motion to Strike was granted as to any conclusion or opinion that any Defendant violated RESPA or the Sherman Act with respect to any Plaintiff, and was denied as to the remainder of the requested relief. *Id.*

## BACKGROUND

Plaintiffs and putative class members are borrowers who have or had a federally related mortgage loan originated and/or brokered by Defendants.  (ECF No. 33 ¶ 1.)  Plaintiffs allege they are victims of an "illegal kickback scheme," under which the Eagle Defendants' loan officers, agents, and/or other employees received and accepted illegal kickbacks from All Star Title, Inc. ("All Star") in exchange for the assignment and referral of residential mortgage loans in violation the RESPA.  *Id.* ¶ 2.

Plaintiffs allege that, beginning around 2008, All Star paid kickbacks to participating lenders in exchange for those lenders referring mortgage borrowers to All Star for its services.  *Id.* ¶ 18.  When a participating lender referred a borrower to All Star pursuant to this scheme, All Star overcharged the borrower and transmitted the kickback to a third-party marketing company under the guise of paying a marketing fee owed by All Star.  *Id.* ¶¶ 18-21, 27.  Plaintiffs allege that Eagle Defendants joined All Star's scheme in 2009 and that kickbacks were regularly laundered through sham marketers and received by three Eagle Bank branches located in Forest Hill, Bel Air, and Owings Mills, Maryland.  *Id.* ¶¶ 43-45, 49, 53, 57.  These kickbacks were made for the benefit of Eagle Defendants and solely for the referral of loans.  (ECF No. 112-1 at 5.)  For more than two years, Eagle Defendants received and accepted over $150,000 in kickbacks from All Star in exchange for assigning and referring 534 loans.  *Id.* at 7.

Plaintiffs further allege that to fund the kickbacks, Eagle Defendants and All Star entered price fixing agreements to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans in violation of the Sherman Act.  (ECF No. 33 ¶ 2.)  Specifically, if a lender did not accept or receive kickbacks, that lender's borrowers

were charged a fee of $1,000, which included title insurance; if a lender did receive kickbacks, its borrowers were charged in excess of $1,000 to offset the kickback.  (ECF No. 112-1 at 8.)

Plaintiffs contend that Eagle Defendants fraudulently concealed the alleged kickback scheme from Plaintiffs and putative class members in various ways.  (ECF No. 33 ¶ 4.)  First, Plaintiffs allege that the kickback agreement was portrayed as a "marketing plan." (ECF No. 112-1 at 13.)  "For example, in February 2010, All Star paid the Eagle Defendants a $3696.07 kickback laundered through third party marketing company Influence Direct.  The Eagle Defendants and All Star caused Influence Direct to issue an invoice to All Star for the amount of the kickback payment." *Id.*  This sham invoice issued to All Star made it appear as though All Star paid for and received a printed direct mail piece; in reality, Plaintiffs allege, All Star received no marketing services from Influence Direct.  *Id.* at 13-14.  Second, Plaintiffs allege that Eagle Defendants and All Star incorporated these misrepresentations into borrowers' loan documents by including the fraudulent charges in the "Good Faith Estimate." *Id.* at 15.  These false representations were further portrayed on the Eagle borrowers' HUD-1 Settlement Statements and Closing Disclosures. *Id.*  Lastly, on federally-insured loans, Eagle Defendants "falsely certified that the charges appearing on the borrowers' HUD-1 complied with all HUD and/or VA guidelines." (ECF No. 112-1 at 16.)  Plaintiffs assert that these fraudulent concealment practices prevented borrowers, regulators, and auditors from discovering the scheme, thereby allowing the alleged kickbacks and fraudulent charges to continue.  (ECF No. 33 ¶ 4.)

Plaintiffs request certification of one class with two subclasses:

The Eagle Class:

> All individuals in the United States who were borrowers on a loan originated or brokered by Eagle National Bank or Eagle Nationwide Mortgage Company for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's

HUD-1, between January 1, 2009, and December 31, 2011. Exempted from this class is any person who, during the period of January 1, 2009 through December 31, 2011, was an employee, officer, member and/or agent of Defendants Eagle National Bank, Eagle Nationwide Mortgage Company, Eagle National Bancorp Inc., ESSA Bank & Trust, Inc., ESSA Bancorp Inc., or All Star Title, Inc.; and any judicial officer who handles this case, and the immediate family members of such judicial officer(s).

The Antitrust Subclass:[2]

The Antitrust Subclass is comprised of all members of the Eagle Class.

The RESPA Subclass:

All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Eagle National Bank or Eagle Nationwide Mortgage Company for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2009, and December 31, 2011.

(ECF No. 112-1 at 20-21.)

Defendants argue that the named Plaintiffs do not meet the requirements for class certification because: (1) the named Plaintiffs have not satisfied the Rule 23(a) requirements of typicality and adequacy of representation; and (2) Rule 23(b)(3) predominance cannot be met. (ECF No. 127 at 1.)  More specifically, Defendants argue that "All Star's use of varying flat composite fees for the title services charged to Eagle borrowers—including the regulated cost of title insurance—makes it impossible for Plaintiffs to establish the presence of an overcharge on a class-wide basis." *Id.*  Therefore, they continue, "proof that any borrower suffered the injury needed for standing and liability will require a highly individualized, fact-intensive inquiry as to whether that borrower actually paid an overcharge for title services." *Id.*

---

[2] Plaintiffs refer to an "Antitrust Class" on p. 20 of the Motion.  The court appreciates this to pertain to the requested Antitrust Subclass.

# LEGAL STANDARD

## Federal Rule of Civil Procedure Rule 23

Federal Rule of Civil Procedure 23 governs class certification.

> (a) Prerequisites.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> >
> > (2) there are questions of law or fact common to the class;
> >
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  The prerequisites are commonly referred to as "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).

After satisfying the Rule 23(a) prerequisites, a plaintiff must show that the proposed class action fits into one of the categories in Rule 23(b).  *See* FED. R. CIV. P. 23(b).  As relevant to this case, Rule 23(b)(3) provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).  The factors relevant to predominance and superiority include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A) – (D).

Each of Plaintiffs' proposed subclasses must also meet the requirements in Rule 23(a) and Rule 23(b). FED. R. CIV. P. 23(c)(5); *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 441 (4th Cir. 2003); *Coreas v. Bounds*, No. TDC-20-0780, 2020 U.S. Dist. LEXIS 171386, at *24 (D. Md. Sept. 18, 2020) (holding that "[s]ubclasses must independently satisfy each of the requirements set out in Rule 23(a) and (b)").

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). "It is the plaintiffs' burden to demonstrate compliance with Rule 23, but the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT Prod. Co.*, 764 F.3d at 358 (citing *Wal-Mart*, 564 U.S. at 351). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

"The 'rigorous analysis' that must be undertaken in the class certification context extends to disputes between experts." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 336 (D.

Md. 2012).   "Resolving expert disputes in order to determine whether a class certification requirement has been met is always a task for the court—no matter whether a dispute might appear to implicate the 'credibility' of one or more experts, a matter resembling those usually reserved for a trier of fact."   *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 324 (3d. Cir. 2008). "Rigorous analysis need not be hampered by a concern for avoiding credibility issues, [because] findings with respect to class certification do not bind the ultimate fact-finder on the merits."   *Id.* "A court's determination that an expert's opinion is persuasive or unpersuasive on a Rule 23 requirement does not preclude a different view at the merits stage of the case."   *Id.*

## ANALYSIS

Before turning to the requirements of Rule 23, the court will address Defendants' argument that the named Plaintiffs lack standing, which Defendants incorporate into their 23(a)(3) typicality challenge.  (ECF No. 127 at 15.)[3]

### I.   Standing of Named Plaintiffs

Defendants argue that the named Plaintiffs have not suffered a concrete injury, so their claims cannot be typical of the putative class.  (ECF No. 127 at 15.)  Specifically, Defendants argue that the named Plaintiffs "have not suffered an injury-in-fact in the form of an overcharge as a result of an alleged kickback from All Star."  *Id.* at 23.  In support, Defendants rely on *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244 (4th Cir. 2020), for the proposition that the named Plaintiffs must show that they were overcharged for title and settlement services.  (ECF No. 127

---

[3] The court notes that Defendants' typicality argument overlaps with Defendants' standing argument.  The court will address Defendants' standing argument at the outset before addressing the question of class certification.  *See* 1 B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 2:2 (6th ed. 2022) (explaining that "Article III standing is a jurisdictional issue and is logically determined at the outset of the case . . ." and in a class action named plaintiffs "must have standing to pursue their individual claims or else those claims are non-justiciable and the court would logically never reach their motion for certification of a class"); *In re Marriott Int'l, Inc.*, 341 F.R.D. 128, 140 (D. Md. 2022) (addressing standing inquiry prior to Rule 23(a) prerequisites); *Brasko v. Howard Bank*, No. SAG-20-3489, 2022 U.S. Dist. LEXIS 57627, at *4 (D. Md. Mar. 20, 2022) (same); *Coreas*, 2020 U.S. Dist. LEXIS 171386, at *25 (same).

at 16.)  In their Reply, Plaintiffs direct the court's attention to *Brasko v. Howard Bank*, No. SAG-20-3489, 2022 U.S. Dist. LEXIS 57627 (D. Md. Mar. 30, 2022).

In a class action, standing is "based on the allegations of personal injury made by the named plaintiffs."  *Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017); *see* 1 B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 2:3 (6th ed. 2022) (explaining that "in class action cases, the standing inquiry focuses on the class representatives").  Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  A plaintiff bears the burden of establishing these three elements.  *Id.*

"[T]he procedural posture of the case dictates the plaintiff's burden as to standing."  *Beck*, 848 F.3d at 270; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (holding that "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation").  "Thus, when a defendant challenges a plaintiff's standing, we analyze the challenge differently depending on the stage of litigation at which the challenge is brought and the substance of the defendant's arguments."  *Overbey v. Mayor of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019).  Accordingly, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, but at the summary judgment stage, plaintiffs must set forth by affidavit or other evidence specific facts supporting standing."  *In re Marriott Int'l, Inc.*, 341 F.R.D. 128, 140-41 (D. Md. 2022) (quoting *Lujan*, 504 U.S. at 561).

In this case, the parties engaged in class certification discovery; "merits discovery will continue post-certification."  *See id.* at 141 (noting that "the pleading-stage burden applies until

summary judgment" because there are "only three general phases of litigation—pleading, summary judgment, and trial . . . and Rule 23 does not—and cannot—add an additional step to the litigatory life cycle").  Accordingly, the court will apply the pleading-stage burden to analyze the named Plaintiffs' standing, that is whether the named Plaintiffs' plausible allegations, taken as true, are enough to meet Article III standing.  *Overbey*, 930 F.3d at 227.  Although Defendants may raise their standing arguments again in a Rule 56 motion, at the class certification stage, the named Plaintiffs must only satisfy the pleading-stage burden.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  In *Spokeo*, the Supreme Court made clear that a plaintiff may not "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III."  578 U.S. at 341.  Rather, "a plaintiff suffers a concrete injury if she shows the harm stemming from the 'defendant's statutory violation is the type of harm Congress sought to prevent when it enacted the statute.'"  *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 253 (4th Cir. 2020) (quoting *Curtis v. Propel Pro. Tax Funding, LLC*, 915 F.3d 234, 240-41 (4th Cir. 2019)).

### A.      RESPA, 12 U.S.C. § 2607(a)

"Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).  The Fourth Circuit addressed RESPA standing in *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244 (4th Cir. 2020).  In *Baehr*, two homeowners alleged that Lakeview Title Company paid kickbacks for settlement service referrals to real estate agents at Creig Northrop.  *Id.* at 247, 250.  After discovery, the defendants moved for summary judgment

on grounds that the plaintiffs lacked Article III standing, and the district court agreed.  *Id.* at 251.

The district court "concluded that the [plaintiffs] lacked Article III standing because they were not

overcharged for settlement services and had not otherwise suffered a concrete injury as necessary

to establish injury-in-fact."  *Id.*

On appeal, the plaintiffs asserted "that the deprivation of impartial and fair competition

between settlement services providers is a concrete injury under RESPA" and that an overcharge

is not necessary for RESPA standing.  953 F.3d 244, 253 (4th Cir. 2020).  Accordingly, the Fourth

Circuit addressed the question "whether the deprivation of impartial and fair competition between

settlement services providers — an intangible harm — is nevertheless a concrete injury."  *Id.*  The

*Baehr* court looked to Congress' intent for enacting RESPA:

> Cognizant that a statutory cause of action is not a replacement for
> concrete injury, we recognize that a plaintiff suffers a concrete
> injury if she shows the harm stemming from the "defendant's
> statutory violation is the type of harm Congress sought to prevent
> when it enacted the statute." Congress enacted RESPA to protect
> consumers from "certain abusive practices" that had resulted in
> "unnecessarily high settlement charges." Relevant here,  those
> abusive practices include "kickbacks or referral fees that tend to
> increase unnecessarily the costs of certain settlement services."
> Accordingly, as codified at 12 U.S.C. § 2607(a), RESPA provides
> that "[n]o person shall give and no person shall accept any fee,
> kickback, or thing of value pursuant to any agreement or
> understanding . . . that business incident to or a part of a real estate
> settlement service . . . shall be referred to any person." RESPA's
> proscription against kickbacks is enforceable by federal agencies,
> state attorneys general and insurance commissioners, and private
> citizens. The cause of action for private citizens is limited, however,
> to claims for damages "equal to three times the amount of any
> charge paid" for settlement services rendered in contravention of §
> 2607(a).
>
> Plainly, in proscribing the payment of "formal kickbacks" for
> referrals of business to settlement services providers, Congress
> aimed to eliminate a practice that it believed interfered with the
> market for settlement services.   To say that RESPA protects
> consumers from kickbacks' interference with the market for

> settlement services is not to say, however, that interference with the market is the harm to consumers that Congress sought to prevent through RESPA.  Indeed, Congress specified in RESPA that by prohibiting kickbacks, the harm it sought to prevent is the increased costs that "tend" to result from kickbacks' interference with the market for settlement services.

953 F.3d at 253-54 (internal citations omitted).  In holding that the plaintiffs lacked standing, the *Baehr* court noted that the plaintiffs did not contend "that they were harmed by being overcharged for settlement services.  Instead, the Baehrs contend that they were harmed by being deprived of impartial and fair competition between settlement services providers."  *Id.* at 254.  Accordingly, the *Baehr* court held that the deprivation of impartial and fair competition "untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury under RESPA."  *Id.* at 255.

Similar to the plaintiffs in *Baehr,* the named Plaintiffs allege they suffered harm because they were "deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers."  (ECF No. 33 ¶¶ 96, 102.)  As the *Baehr* court noted, a deprivation of impartial and fair competition alone is not a concrete injury under RESPA.  Consistent with congressional intent, the named Plaintiffs must demonstrate they were injured by "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."  *Baehr*, 953 F.3d at 254 (quoting 12 U.S.C. § 2601(b)(2)).

While the *Baehr* court's analysis of congressional intent is instructive in this case, the present case materially differs from *Baehr*.  *Baehr* was an appeal from entry of summary judgment. At that litigation stage, the plaintiffs were required "to 'set forth by affidavit or other evidence specific facts' that, when taken as true, establish each element of Article III standing."  *Baehr*, 953 F.3d at 253 (quoting *Lujan*, 504 U.S. at 561).  Moreover, and importantly, in *Baehr*, the plaintiffs did not argue they were harmed by a settlement service overcharge.  Although the named Plaintiffs,

similar to the *Baehr* plaintiffs, allege they suffered harm because they were "deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers," the Complaint further alleges the named Plaintiffs were:

> . . . harmed because he is (1) charged and pays fraudulent charges for title and settlement services including amounts that are not related to any legitimate title and settlement services and charged to fund illegal kickbacks; (ii) charged and pays unnecessarily increased and higher title and settlement services fees than he would have paid without the illegal Kickback and Price Fixing Agreements; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

(ECF No. 33 ¶¶ 96, 102.)   Here, unlike the *Baehr* plaintiffs, Plaintiffs expressly allege that Defendants' scheme caused them harm in the form of higher title and settlement fees.  The harm alleged by Plaintiffs is precisely the harm Congress sought to prevent with RESPA.

Defendants next argue the definition of overcharge first requires the court to determine the "reasonable value" of services because an overcharge occurs when "one performs settlement services itself but charges a fee that is substantially higher than its reasonable cost."  (ECF No. 127 at 17) (quoting *Tubbs v. N. Am. Title Agency, Inc.,* 389 Fed. Appx. 104, 108 (3d Cir. 2010)). In support of their position, Defendants rely on *Freeman v. Quicken Loans, Inc.*, 626 F.3d 799 (5th Cir. 2010) and *Tubbs*.

The plaintiffs in *Tubbs* and *Freeman* alleged violations of RESPA, 12 U.S.C. § 2607(b). *See Tubbs*, 389 Fed. Appx. at 105 (explaining that "[a]ppellants claim that this violated § 8(b) of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607(b)"); *Freeman*, 626 F.3d at 801 (analyzing "whether section 8(b) of the Real Estate Procedures Act, 12 U.S.C. § 2607(b), prohibits lenders and others from charging 'unearned, undivided' fees to borrowers at the closing of a

mortgage transaction").  On a pleading-stage standing challenge, however, Plaintiffs are not required "to show a particular overcharge for a particular settlement service" as required under 12 U.S.C. § 2607(b).  Instead, Plaintiffs "must demonstrate that they were injured by 'kickbacks or referrals that tend to increase unnecessarily the costs of certain settlement services.'"  *See Brasko v. Howard Bank*, No. 20-3489-SAG, 2022 U.S. Dist. LEXIS 57627 *7 (D. Md. Mar. 30, 2022) (holding that "[p]laintiffs' theory of injury is not dependent on their ability to show a particular overcharge for a particular settlement service – the hallmark of illegal fee splitting cases under 12 U.S.C. § 2607(b).  Instead, Plaintiffs must show unlawful 'business referrals' (*i.e.*, kickbacks) under 12 U.S.C. § 2607(a).  Contrary to [the defendants'] argument, then, Plaintiffs need not point to a particular overcharge, but instead must demonstrate that they were injured by 'kickbacks or referrals that tend to increase unnecessarily the costs of certain settlement services.'" (quoting *Baehr*, 953 F.3d at 254)).

Here, Plaintiffs have proffered sufficient preliminary evidence to support their claims that "Eagle Defendants agreed to assign and refer residential mortgage loans to All Star for title and settlement services in exchange for kickbacks." (ECF No. 112-1 at 1.)  At this stage, Plaintiffs adequately support their assertion that Eagle Bank and All Star agreed to amounts that All Star would charge borrowers to "pay for the kickbacks;" that the scheme was employed at the time of Plaintiffs' loans; and the unlawful kickbacks are reflected on the Plaintiffs' loan documents.  (ECF Nos. 112-1 at 1; 112-13, Ex. 12; 112-18, Ex. 17; 112-20, Ex. 19; 112-37, Ex. 36; 112-38, Ex. 37.)  Plaintiffs' allegations that All Star boosted its fees to offset a kickback ably overcomes the "bare statutory violation" threshold.  *See Bezek v. First Mariner Bank*, No. SAG-17-2902, 2020 U.S. Dist. LEXIS 183174, at *9 (D. Md. Oct. 2, 2020) (holding that the plaintiffs alleged more than a bare statutory violation by arguing that the defendant would have charged them a lower fee had it

not been accounting for the kickback agreement and presenting corroborating evidence indicating the plaintiffs' may have been overcharged).

Plaintiffs have also presented corroborating evidence of overcharges. Plaintiffs' expert Mr. Watkins reviewed HUD-1 statements, inflation tables and Consumer Price Index Tables, a Wells Fargo Bank News Flash, Wells Fargo Bank Chart, and relied upon his banking experience, to conclude the fees Defendants charged Plaintiffs were excessive and that Plaintiffs were overcharged for title services.[4]  (ECF No. 131-1, Ex. 47.)  Although Defendants and their expert dispute whether the named Plaintiffs were overcharged, "standing in a RESPA suit is sufficiently established at the class certification stage, even when the parties present contradicting evidence about whether the alleged harm to plaintiffs occurred." *Dobbins v. Bank of Am., N.A.*, No. SAG-17-0540, 2020 U.S. Dist. LEXIS 156315, at *13 (D. Md. Aug. 28, 2020) (concluding that the plaintiffs set forth sufficient evidence to meet Article III standing requirements by presenting "some evidence to corroborate the claim that they were harmed by paying higher fees than they would have absent the alleged RESPA violation"); *Edmondson v. Eagle Nat'l Bank*, 336 F.R.D. 108, 113 (D. Md. 2020) (finding that the plaintiff provided enough evidence about being overcharged despite the defendants' expert's conclusion that the fee charged to the plaintiff was "below the market rate for comparable title and settlement services").

---

[4] Defendants object to the admissibility of the Wells Fargo documents.  (ECF No. 127 at 21-22.)  As two other district judges in the Fourth Circuit have noted: "when the filing of a class certification motion occurs prior to full discovery having been afforded to the party seeking to certify one or more classes (and the moving party relies on the opinions of an expert to do so), the inability of the expert to express opinions that are fully supported by all the facts does not provide a basis for striking the expert's opinions." *In re Marriott Int'l, Inc.*, No. 19-md-2879, 2022 U.S. Dist. LEXIS 80510, at *329-30 (D. Md. May 3, 2022) (quoting *Robinson v. Nationstar Mortg. LLC*, No. 14-3667, 2019 U.S. Dist. LEXIS 153526, *47 (D. Md. Sept. 9, 2019)).  Defendants' criticism of Mr. Watkins' consideration of and reliance on the Wells Fargo documents may go to the weight and credibility of his opinions, but it does not preclude the admissibility of Mr. Watkins' opinions on the issue of class certification. The issues complained of by Defendants with respect to the Wells Fargo documents are best resolved on cross-examination.

The court expresses no view at this time as to whether the named Plaintiffs or any putative Class members were actually overcharged for the services rendered by All Star. At this stage of the litigation, the named Plaintiffs have proffered enough evidence to meet the requirements of Article III standing. As the litigation proceeds, it may become clear that Plaintiffs were not overcharged for title and settlement services. *See Bezek*, *supra*. Accordingly, Defendants may continue to challenge Plaintiffs' Article III standing as the litigation progresses.

**B.      Sherman Act, 15 U.S.C. § 1**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). First, "[t]o prove a violation of [that provision], a plaintiff must show the existence of an agreement in the form of a contract, combination, or conspiracy that imposes an unreasonable restraint on trade." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991). "The second element, injury, involves two distinct inquiries: (1) 'whether the plaintiff has indeed suffered harm, or 'injury-in-fact,' and (2) 'whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'" *Mr. Dee's Inc. v. Inmar, Inc.*, No. 19-cv-141, 2021 U.S. Dist. LEXIS 176176, at *30 (M.D.N.C. Sept. 16, 2021) (quoting *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106 (2d Cir. 2007)) (internal citations omitted). As to the second prong, "[t]o establish an antitrust injury, [p]laintiffs' losses must stem from anticompetitive acts . . . that 'reduce output or raise prices to consumers.'" *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362, 395 (M.D.N.C. 2002) (quoting *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516 (4th Cir. 2002).

Injury-in-fact and damages are distinct elements— "injury-in-fact is whether the plaintiffs were harmed and damages quantify by how much." *Mr. Dee's Inc.*, 2021 U.S. Dist. LEXIS 176176, at *31 (quoting *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2009)). "However, a single calculation may show both injury-in-fact and damages: 'if [a plaintiff] paid a higher actual price than the but-for price, he has shown [injury-in-fact]; by calculating the extent of that difference[,] he has shown damages.'" *Id.* at *31-32 (quoting *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. at 88).

Here, the named Plaintiffs have proffered evidence sufficient to support their contention that "Eagle Defendants and All Star entered into per se price-fixing agreements effectively defrauding borrowers into paying fraudulent charges for title and settlement services including amounts that were not associated with any legitimate title and settlement services . . ." (ECF No. 112-1 at 1.) Plaintiffs provided preliminary evidence that "but for the Eagle Defendant[s'] receipt and acceptance of kickbacks from All Star," Plaintiffs would have paid a lower price for title and settlement services. (ECF No. 131 at 8.) Additionally, Plaintiffs allege numerous, specific kickbacks that were laundered through specific sham marketers and received by Eagle Defendants. Plaintiffs' evidence further supports that Eagle Defendants agreed to a fixed price that All Star would charge, which exceeded the price that All Star charged to borrowers referred from other lenders outside of the scheme.

Further, Plaintiffs have presented adequate corroborating evidence that they were overcharged. As stated in Section I.A., Plaintiffs' expert Mr. Watkins reviewed the Wells Fargo State Averages chart, and opined that Plaintiffs were overcharged for title services. According to Mr. Watkins, the Wells Fargo State Averages chart presents the mean, median, and 80th percentile for title examination fees and shows the 80th percentile for Maryland title examination fees at

$497.  (ECF No. 131-2, Ex. 47.)  Mr. Wilson's HUD-1, Exhibit 36, tends to demonstrate that All Star charged him $475.80 for title insurance and $819.00 for a title exam.  The Unthanks HUD-1, Exhibit 37, tends to demonstrate that All Star charged them $1,480.40 for title insurance and $627.20 for a title exam.  Plaintiffs contend they would have paid $1000.00 "but for" Eagle Defendants' alleged kickback scheme and price-fixing agreement.  (ECF No. 131 at 8.)  Mr. Wilson contends he was charged (and paid) $294.80 more than he would have been charged in the absence of the scheme; the Unthanks contend they were overcharged by $1,107.60. *Id.*  The named Plaintiffs have proffered enough evidence to meet the requirements of Article III standing under the Sherman Act.

## II.   <u>Standing of Absent Class Members</u>

Defendants argue that Plaintiffs do not satisfy the predominance requirement of Rule 23(b)(3) because the court may not infer that other class members paid increased settlement costs just because the named Plaintiffs did.  (ECF No. 127 at 32.)  Although Defendants raise this argument under the predominance prong, distilled to its simplest form, Defendants argue that absent class members lack standing.  In support of their position, Defendants rely on *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), for the proposition that the court may not infer that the putative Class paid increased settlement fees.  (ECF No. 127 at 32.)

In *TransUnion*, the Court addressed whether the 8,185 class members had Article III standing to sue TransUnion for its alleged violations of the Fair Credit Reporting Act.  141 S. Ct. at 2207.  Emphasizing the difference "between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law," the Court concluded that "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that

private defendant over that violation in federal court." *Id.* at 2205. In so holding, the Court reminds the reader that, as set forth in *Lujan* "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* at 2208 (quoting *Lujan*, 504 U.S. at 561).

*TransUnion* is procedurally distinct from the present case because the *TransUnion* Court addressed Article III standing in the context of a case that proceeds to trial. *Id.* (explaining that "in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial.'" (quoting *Lujan*, 504 U.S. at 561)). Although the Court stated "[e]very class members must have Article III standing in order to recover individual damages," the Court did not address "whether every class member must demonstrate standing before a court certifies a class." *Id.* at 2208 n.4. Defendants' reliance on *TransUnion* fails to appreciate the stage of the current litigation. As explained above, the named Plaintiffs are only required to satisfy the pleading-stage burden at the class certification stage and are not obliged to demonstrate that every putative Class member has standing at the class certification stage.[5] *See Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (noting that "[i]n a class action matter, we analyze standing based on the allegations of personal injury made by the named plaintiffs").

## III.   <u>Rule 23(a) Prerequisites</u>

### A.   **Ascertainability/Identifiability**

In addition to the factors in 23(a) and (b), the Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of the proposed class be

---

[5] However, the court notes that as discussed in Section IV.A., *infra*, "Plaintiffs must show that differences between class members as to standing—i.e., the inclusion of uninjured individuals alongside injured ones in the class—are not so significant that the class runs afoul of Rule 23." *In re Marriott Int'l, Inc.*, 341 F.R.D. 128, 141 (D. Md. 2022).

'readily identifiable.'" *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). "A class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.* "The plaintiffs need not be able to identify every class member at the time of certification. But '[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate.'" *Id.* (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)); *see Brasko v. Howard Bank*, No. 20-3489-SAG, 2022 U.S. Dist. LEXIS 57627, at *10 (D. Md. Mar. 30, 2022) (explaining that "[t]he class definition must simply 'ensure that there will be some administratively feasible [way] for the court to determine whether a particular individual is a member at some point'") (quoting *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019)).

The proposed Eagle Class and Antitrust Subclass are defined by simple, objective criteria. All of the Class and Subclass members' loans were initiated by Eagle and referred to All Star between January 1, 2009, and December 31, 2011. The RESPA Subclass is also defined by simple, objective criteria: all members of the Subclass class (1) received a federally related mortgage loan originated or brokered by Eagle National Bank or Eagle Nationwide Mortgage Company between January 1, 2009, and December 31, 2011, and (2) received settlement services from All Star.

Plaintiffs have already identified members of the putative Class and the Subclasses through data obtained from All Star's business records and Title Express loan processing data. (ECF No. 112-1 at 2-3; ECF No. 112-3, Ex. 2.)[6] The full, unredacted spreadsheets, filed under seal at ECF No. 112-2, contain "identifying information for the borrowers who are the members of the Eagle Class, including social security number, mailing address, property address, telephone number, and

---

[6] Plaintiffs contend that the borrowers on the 534 Eagle Class loans are the members of the proposed Eagle Class. (ECF No. 112-1 at 3.)

in most instances, a loan number and mortgage insurance case number." *Id.* Members of the putative Class and Subclasses are readily identifiable.

### B.     Numerosity

Rule 23(a)(1) provides that a class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "No specified number is needed to maintain a class action." *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). However, "as a general guideline, . . . a class that encompasses fewer than 20 members will likely not be certified . . . while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (quoting 1 *Newberg on Class Actions* § 3:12 (5th ed. 2021)). "Plaintiffs need not establish the precise number of class members at the certification stage to satisfy the numerosity requirement so long as they provide 'a reasonable estimate of the number of class members.'" *In re Marriott Int'l, Inc.*, 341 F.R.D. 128, 146 (D. Md. 2022) (quoting *Harris v. Rainey*, 299 F.R.D. 486, 489 (W.D. Va. 2014)).

Plaintiffs assert—and Defendants do not dispute—that the proposed Class and Subclasses "include more than 800 borrowers on more than 500 Eagle Class loans secured by property spanning the nation." (ECF No. 112-1 at 24.)  The numerosity requirement is met.

### C.      Commonality[7]

Rule 23(a)(2) requires questions of law or fact common to the class.   FED. R. CIV. P.

23(a)(2).   "A common question is one that can be resolved for each class member in a single

hearing."  *Thorn v. Jefferson—Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).   "A question

is not common, by contrast, if its resolution 'turns on a consideration of the individual

circumstances of each class member.'"  *Id.* (quoting 7A Charles Allen Wright, Arthur R. Miller &

Mary Kay Kane, *Federal Practice and Procedure* § 1763 (3d ed. 2005)).   "Minor differences in

the underlying facts of individual class members' cases do not defeat a showing of commonality

where there are common questions of law."  *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211,

216 (D. Md. 1997).   "Where the injuries complained of by named plaintiffs allegedly result from

the same unlawful pattern, practice, or policy of the defendants, the commonality requirement is

usually satisfied."  *Parker v. Asbestos Processing LLC*, No. 11-CV-01800, 2015 U.S. Dist. LEXIS

1765, at *19 (D.S.C. Jan. 8, 2015) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 376-77 (2d Cir.

1997)).   "[I]n the anti-trust context, 'courts have held that the existence of an alleged conspiracy

or monopoly is a common issue that will satisfy' the commonality requirement."  *In re Titanium*

*Dioxide Antitrust Litig.*, 284 F.R.D. 328, 337 (D. Md. 2012) (quoting 1 Herbert B. Newberg &

Alba Conte, *Newberg on Class Actions* § 3.10 (4th ed. 2002)).

---

[7] Plaintiffs move to certify the proposed Class and Subclasses under Rule 23(b)(3).  "The same analytical principles' that apply to Rule 23(a) 'govern Rule 23(b).'"  *James v. Acre Mortg. & Fin., Inc.*, No. SAG-17-1734, 2020 U.S. Dist. LEXIS 96633, at *15 (D. Md. June 2, 2020) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).  "The difference, however, is that Rule 23(b)(3)'s predominance requirement [is] 'even more demanding' than, the Rule 23(a)(2) commonality one, imposing a duty upon courts to 'take a close look at whether common questions predominance over individuals one.'"  *Id.* (quoting *Comcast Corp.*, 569 U.S. at 34).  Courts have recognized "that Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 509 (1997); *see James*, 2020 U.S. Dist. LEXIS 96633, at *15 (analyzing predominance and commonality together when the plaintiff moved to certify class under Rule 23(b)(3)); *Edmondson v. Eagle Nat'l Bank*, 336 F.R.D. 108, 114 (2020) (discussing commonality and predominance together when plaintiff moved to certify class under Rule 23(b)(3)).  *See* Section IV.A., *infra*, regarding Rule 23(b)(3).

Each putative Class member's claim alleges that Eagle Defendants violated 12 U.S.C. § 2607(a) and 15 U.S.C. § 1 by implementing referral and price-fixing agreements between All Star and Eagle Bank.  Common questions to the RESPA Subclass include whether a referral agreement existed between Defendants and All Star, whether Defendants received kickbacks from All Star for the referral of business, whether Defendants used third-party marketing companies to facilitate kickbacks, and whether Defendants fraudulently concealed the kickbacks by using sham invoices and payment records.  (ECF No. 33 at 48-49.)  Common questions to the Antitrust Subclass include whether Defendants conspired to fix and fixed title and settlement services fees paid, whether the prices Defendants charged pursuant to the pricing agreements were higher than prices charged outside of an agreement, and whether Defendants concealed the price-fixing agreements through making false representations to borrowers and on borrowers' Good Faith Estimates, HUD-1, and other loan documents.  *Id.* at 52-53.  These questions and answers are common because every putative Class member was subjected to the alleged kickback scheme between All Star and Eagle Bank.  At the core of each Class member's claim is the alleged kickback scheme and price-fixing agreements between All Star and Eagle Bank, which courts routinely find satisfies Rule 23(a)(2).  *James*, 2020 U.S. Dist. LEXIS 96633, at *19.

Plaintiffs meet the commonality requirement of Rule 23(a)(2).[8]

### D.   Typicality

Rule 23(a)(3) requires that "claims or defenses of representative parties are typical of the claims or defenses of the class."  FED. R. CIV. P. 23(a)(3).  "The typicality requirement goes to the heart of a representative parties' ability to represent a class, particularly as it tends to merge with

---

[8] Defendants raise arguments urging that Class and Subclass members' claims are highly individualized, requiring fact-intensive inquiries, but Defendants do not contest commonality directly.  Instead, Defendants raise these arguments in the context of Rule 23(a)(3) typicality and Rule 23(b)(3) predominance.  Accordingly, the court addresses this challenge in its typicality and predominance analyses.

the commonality and adequacy-of-representation requirements." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). "[P]laintiff's claim cannot be so different from the claims of absent claim members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Id.* at 467. "Although a representative's claims and the claims of other members of the class need not be 'perfectly identical or perfectly aligned' . . . the representative's pursuit of his own interests 'must simultaneously tend to advance the interests of the absent class members.'" *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 Fed. Appx. 299, 304-305 (4th Cir. 2013) (quoting *Deiter*, 436 F.3d at 467). Accordingly, the typicality analysis requires "the [c]ourt [to] compare the named plaintiff's claims or defenses with those of absent class members." *In re Marriott Int'l*, 341 F.R.D. at 148.

Plaintiffs allege Defendants harmed all putative Class members through RESPA and Sherman Act violations arising from the same kickback and price-fixing agreements between Eagle Bank and All Star during a specific period. For many of the reasons the court finds that commonality is satisfied, the court also finds that the named Plaintiffs' claims are typical. *See Gen. Tel. Co. of the Southwest Falcon*, 457 U.S. 147, 157 n.13 (1982) (explaining that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge . . . [b]oth serve as guideposts for determining whether under the particular circumstance maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence"). The named Plaintiffs and the absent class members "are similarly situated legally and factually" because Eagle Defendants "pursued the same course of conduct as to all class members." *See In re Marriott Int'l*, 341 F.R.D. at 148; *but see Gresser v. Wells Fargo Bank, N.A.*, No. CCB-12-987, 2014 U.S. Dist. LEXIS 43302, at *10 (D. Md. Mar. 31, 2014) (finding that the named plaintiffs'

claims were atypical when "the conduct constituting the breach under the two theories of liability is different").

Defendants do not argue that the named Plaintiffs do not meet typicality because of differences in their claims for those of absent class members. Instead, Defendants argue that the named Plaintiffs' claims are not typical of the putative Class for two reasons: (1) the named Plaintiffs have not suffered a concrete injury and (2) named Plaintiffs are subject to unique defenses. (ECF No. 127 at 15, 23.) Defendants' argument contesting typicality on the basis that the named Plaintiffs have not suffered a concrete injury is addressed above in Section I.

### i.    *Statute of Limitations*

Defendants argue that whether Class members' claims are barred by the statute of limitations "presents a unique, individualized issue." (ECF No. 127, p. 24.) This court has repeatedly addressed and rejected this argument. *Brasko*, 2022 U.S. Dist. LEXIS 57627, at *20; *Dobbins v. Bank of Am., N.A.*, No. SAG-17-0540, 2020 U.S. Dist. LEXIS 156315, at *18 (D. Md. Aug. 28, 2020); *James*, 2020 U.S. Dist. LEXIS 96633, at *25-28; *Edmondson v. Eagle Nat'l Bank*, 336 F.R.D. 108, 115 (D. Md. 2020). As the *Brasko* court recognized, "Plaintiffs' fraudulent concealment argument hinges on [Eagle Defendants] and All Star's conduct and their efforts to conceal the kickback scheme." *See*, *Brasko supra*. Further, the notice and due diligence elements of the test are "objective inquiries that can be determined on a class-wide basis." *Id.* at *21 (citing *Edmondson*, 922 F.3d at 558). Therefore, the question of whether class members' claims are tolled under the fraudulent concealment doctrine is not so individualized that it destroys typicality. The court "reserves the right to decertify the class action if later factual development reveals that individual class members were uniquely situated such that disparate inquiries into their due

diligence, or any other material issue, predominates over common questions." *Bezek*, 2020 U.S. Dist. LEXIS 183174, at *17.

### ii.     Equitable Tolling, Fraudulent Concealment, and Due Diligence – the Unthanks

Defendants argue that the Unthanks Plaintiffs destroy typicality because the Unthanks' circumstances present facts unique to them. (ECF No. 127 at 23.)  Specifically, Defendants argue that in 2013 the Unthanks brought a lawsuit for fraud on the same mortgage loan transaction at issue in this case. *Id.* at 23.  Therefore, Defendants contend, the Unthanks' claim is not typical because "inquiry into the Unthanks' due diligence[9] based on their 2013 lawsuit, and whether the current claims are time-barred will have no bearing on whether any other class member's claims are barred by the statute of limitations, yet it presents a unique, individualized issue that Defendants are entitled to assert and thoroughly probe." *Id.* at 24.  Accordingly, Defendants argue that whether they engaged in fraudulent concealment, and, in turn, their defenses of failure to exercise due diligence is a highly-fact specific inquiry based on each Plaintiffs' claim. *Id.* at 23-24.  "Unique defenses defeat typicality when 'they threaten to dominate the litigation, particularly when they go to the ability to prove a defendant's liability to the named plaintiffs.'" *See In re Marriott Int'l, Inc.*, 341 F.R.D. at 148 (quoting *Gresser*, 2014 U.S. Dist. LEXIS 43302, at *10).

Claims brought pursuant to RESPA, "must be asserted within one year 'from the date of the occurrence of the violation, which generally refers to the date of closing for loan origination violations.'" *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 U.S. Dist. LEXIS 154582, at *14 (D. Md. 2016) (quoting *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 470 (D. Md.

---

[9] As discussed below, in deciding whether to toll the statute of limitations based on fraudulent concealment, one of the factors the court must consider is whether the plaintiff exercised due diligence, *i.e.*, whether plaintiff acted as a reasonable residential mortgage borrower.

2012)).  "In order to toll RESPA's statute of limitations, a 'plaintiff must allege with specificity 'fraudulent concealment on the part of the defendants' and the inability of the plaintiff, despite due diligence, to discover the fraud.'"  *Id.* at *15.  "The Fourth Circuit has articulated the proper standard that courts should employ when deciding whether to equitably toll a statute of limitations based on fraudulent concealment."  *Brasko*, 2022 U.S. Dist. LEXIS 57627, at *20 (citing *Edmondson v. Eagle Nat'l Bank*, 922 F.3d 535, 548 (4th Cir. 1998)).  "A plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence."  *Edmondson*, 922 F.3d at 548.  "Due diligence only requires investigation where 'an individual has been placed on inquiry notice of wrongdoing.'"  *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 U.S. Dist. LEXIS 154582, at *17 (D. Md. Nov. 8, 2016) (quoting *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)).

"To satisfy the first element of the fraudulent concealment test, a plaintiff must 'provide evidence of affirmative acts of concealment' by the defendants."  *Edmondson*, 922 F.3d at 553 (4th Cir. 2019) (quoting *Supermarket of Marlinton v. Meadow Gold Dairies*, 71 F.3d 119, 126 (4th Cir. 1995)).  "A plaintiff satisfies its burden to allege an affirmative act of concealment if, for example, it alleges that the defendant employed 'some trick or contrivance intended to exclude suspicion and prevent inquiry.'"  *Id.* (quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446-47 (6th Cir. 2012)).  In *Edmondson v. Eagle National Bank*, the court recognized that affirmative acts of concealment may include: (1) "the use of sham entities to conceal the source and flow of the kickback payments;" (2) "the alleged creation of sham business agreements;" and (3) "omitting required information from the HUD-1 Settlement Statement form."  *Id.* at 553-54.

With regard to fraudulent concealment, Plaintiffs allege:

> For most, if not all, of the kickback payments laundered through a third party marketing company, the Eagle Defendants and All Star cause the third party marketing company to issue a sham invoice to All Star. These invoices are a sham, and fraudulent, because these invoices falsely portray that All Star is receiving marketing services from the third party marketing company in exchange for the payments . . .

> As a regular and continuing business practice, the Eagle Defendants and All Star allocate the charges for title and settlement services associated with a borrower's loan only to those categories of title services not included in the APR, thereby falsely minimizing the APR reported on Eagle borrowers' loan documents and required federal disclosures.

> . . . Eagle Defendants and All Star choose to omit from the documents Plaintiff[s] . . . receive[d] at closing, including [their] HUD-1['s], any description or statement of the coordinated business relationship between the Eagle Defendants and All Star under the Kickback and/or Price Fixing Agreements.

> The Eagle Defendants and All Star choose to omit from the documents [Plaintiffs] receive at closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to the Eagle Defendants, or received by the Eagle Defendants from All Star, related to the [Plaintiffs] Eagle loan[s].

(ECF No. 33 ¶¶ 107, 112, 149-150, 165-166.)   Accordingly, the named Plaintiffs' allegations sufficiently set forth Defendants' affirmative acts of concealment.

With respect to due diligence, Plaintiffs allege they did not know about the alleged kickback scheme until after they were contacted by counsel.  (ECF No. 33 ¶¶ 155, 171.)  The Complaint indicates that Plaintiffs filed suit within a year after learning about the alleged kickback scheme.  *Id.* ¶¶ 156, 172.  While it may be true that the Unthanks thought there was an issue with their loan contemporaneous with the transaction, nothing suggests knowledge (constructive or otherwise) or awareness of the alleged kickback scheme at issue here.  *See Fangman*, *supra*.

Accordingly, the court is satisfied at this stage that the named Plaintiffs were not on inquiry notice of their claims.  Defendants are entitled to pursue this argument as the litigation progresses.

The court finds that the named Plaintiffs' claims are typical of the claims or defenses of the absent class members, and that the Unthanks are not subject to unique defenses that dominate the litigation.

### E.    Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4).  "Like the typicality requirement, and in contrast to the requirements of numerosity and commonality, the adequacy requirement focuses on the desired attributes of those who seek to represent the class, as opposed to the characteristics of the class."  1 B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3.50 (6th ed. 2022). "Determining adequacy of representation . . . requires the [c]ourt to determine: (1) whether the named plaintiffs [and their counsel] have any conflicts of interest with other class members; and (2) whether the named plaintiffs [and their counsel] will prosecute the action vigorously on behalf of the entire class."  *In re Marriott*, 341 F.R.D. at 150.  "[T]he Fourth Circuit has held that to disqualify class plaintiffs or counsel based on a conflict between them, the conflict 'must go to the heart of the litigation.'"  *Brasko*, 2022 U.S. Dist. LEXIS 57627, at *25 (quoting *Gunnells*, 348 F.3d at 430-31).

### i.    *Conflicts of Interest*

### a.    <u>Class Representatives – Rule 23(a)(4)</u>

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).  "[A] class representative must be part of the class and 'possess the same interest and

suffer the same injury' as the class members." *Id.* at 625-26 (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

Defendants do not dispute that named Plaintiffs have no conflicts with other class members.  The named Plaintiffs' claims are virtually identical to those of other Class members; all alleged injuries arise from the same kickback and price-fixing scheme; and the absent Class members are entitled to the same remedies as the named Plaintiffs.  The court finds that Rule 23(a)(4) is satisfied.

**b.      <u>Class Counsel – Rule 23(g)</u>**

"[U]nder Rule 23(a)(4), courts consider whether counsel are "qualified, experienced and generally able to conduct the litigation." 1 B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3.72 (6th ed. 2022).  "In 2003, Congress amended Rule 23 to add subdivision 23(g). . . . [and] a majority of courts now recognize that Rule 23(g) alone governs the analysis of class counsel's adequacy." *Id.* Rule 23(g)(1)(A) requires courts to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

FED. R. CIV. P. 23(g)(1)(A).  The rule further allows the court to consider any "other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(1)(B).

Defendants argue that Plaintiffs' counsel may not serve as Class counsel on the basis that they violated ethical duties and created conflicts of interest with Plaintiffs and potential Class

members because of a settlement with All Star in *Godswill Uche v. All Star Title, Inc*, No. 03-C-18-4296, in the Circuit Court for Baltimore County (2018).  (ECF No. 127 at 25.)  In the *Uche* case, the claims asserted against All Star were predicated on conduct similar to that at issue in this case.  All Star settled the case with Uche on an individual basis.  *Id.* at 2.  The *Uche* settlement is memorialized in two documents: (1) a Confidential Settlement Agreement and Release; and (2) a Cooperation Agreement and Agreement Not to Institute Litigation.[10]  *Id.*

Subsequently, Defendants assert, Plaintiffs' counsel used information gained as a result of the settlement to identify additional potential clients.  *Id.* at 4.  Plaintiffs contend that the Cooperation Agreement "was the basis for establishing the All Star Receiver[11] and the collection and preservation of All Star's records that continues to this day."  (ECF No. 131 at 19.)  Defendants suggest that Plaintiffs' counsel was obligated to inform the named Plaintiffs of the *Uche* settlement and that "[b]y entering the Agreement Not to Sue as part of the *Uche* settlement, Plaintiffs' counsel violated Maryland Rule of Professional Conduct 19-305.6(b)."  (ECF No. 127 at 25-26; "MRPC.")

Section 19-305.6(b) of MPRC provides: "An attorney shall not participate in offering or making: an agreement in which a restriction on the attorney's right to practice is part of the settlement of a client controversy."  It is not entirely clear what conflict Defendants believe exists in this case.  Defendants rely on *In re Hager* for the proposition that "[a]n agreement by the lawyer that he will not represent anyone who has a claim against the settling defendant is clearly a restriction of the lawyer's right to practice law."  812 A.2d 904, 919 (D.C. 2002).

The *Hager* court framed the issue as follows:

> The issue in this bar disciplinary proceeding is whether an attorney
> may ethically enter into an agreement with an opposing party in

---

[10] Defendants refer to it as the Cooperation Agreement and Agreement Not to Institute Litigation, while Plaintiffs refer to it as the "Cooperation Agreement."

[11]  All Star Receiver refers to a Circuit Court for Baltimore County order that preserved All Star's servers and business records while All Star was going out of business.  (ECF No. 112-1 at 2.)

> which his clients are awarded full purchase price refunds (amid
> other relief) but where the attorney secretly and without the
> knowledge of the clients 1) receives (together with his co-counsel)
> $ 225,000 as attorneys fees and expenses, 2) agrees never to
> represent anyone with related claims against the opposing party, and
> 3) agrees to keep totally confidential and not to disclose to anyone
> all information learned during his investigations.

*Id.* at 908.

In *Hager*, two healthcare professionals, Duke and Littlewood, contacted respondent Mark Hager to discuss pursuing legal action against Warner-Lambert Co. with regard to its head-lice shampoo, Nix. *Id.* at 908-909. Duke and Littlewood entered in a "Contingent Fee Agreement" with Hager and another attorney, Traficonte. *Id.* at 909. Subsequently, "Warner-Lambert, Traficonte, and Hager entered into a 'Settlement Agreement' without the knowledge of Duke, Littlewood, or any of their clients." *Id.* The provisions of the settlement agreement included: (1) "Traficonte and respondent [Hager] would not assert any Nix-related claims against Warner-Lambert on behalf of anyone, including their current clients;" (2) "Warner-Lambert would pay Traficonte and respondent '$225,000 for investigating, developing, preparing, advancing and addressing by negotiation with Warner-Lambert' potential claims concerning Nix." *Id.* at 909-910.

The *Hager* court found that Hager's participation in the Settlement Agreement violated D.C. Rule of Professional Conduct 5.6(b) with respect to conduct during settlement; specifically, "[a] lawyer shall not participate in offering or making: an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between parties." *Id.* at 917. The court explained that "case law is scarce if nonexistent on this issue. . . . [however,] [t]he Board concluded that while the clients did not technically waive their rights to sue in the Settlement Agreement . . . they did lose their attorneys, their attorney's work product and the names of

31

potential class members, which the Board believed was close to the equivalent of a release of their claims." *Id.* at 918.  The court placed considerable emphasis on the finding that the Settlement Agreement "resulted in the clients losing both their lawyers and the work done on their behalf." *Id.*

*Hager* involves materially different circumstances from the present case.  The conflict in *Hager* arose between the lawyer and his current as well as future clients.  There is no conflict in this case between or among Plaintiffs' counsel, Plaintiffs' counsels' current clients (the Unthanks and Wilson), or Plaintiffs' counsels' future clients (putative Class members).  Further, Plaintiffs' counsel refutes receipt of any money from the *Uche* settlement or the Cooperation Agreement, and Defendants do not so contend.  (ECF No. 131 at 21.)  Moreover, and importantly, Plaintiffs' counsel represents All Star scheme victims in several lawsuits in various jurisdictions, and the settlement reached with All Star in *Uche* materially and directly benefits Plaintiffs and putative Class members here.  Plaintiffs' counsels' strategic decision to settle with All Star in order to gain considerably valuable evidence for the direct benefit of clients to whom they owe a duty in this action raises no conflict of the sort Defendants accuse Plaintiffs' counsel of creating.  Finally, even if this court were to conclude that the agreement created some semblance of conflict, it surely does not go to the heart of the litigation.  *Gunnells*, 348 F.3d at 430-31; *see Brasko v. Howard Bank*, No. SAG-20-3489, 2022 U.S. Dist. LEXIS 57627 (D. Md. Mar. 20, 2022); *Remsnyder v. MBA Mortg. Servs.*, No. CCB-19-0492, U.S. Dist. LEXIS 171861 (D. Md. Sept. 9, 2021); *Somerville v. West Town Bank & Trust*, No. PJM-19-490, 2020 U.S. Dist. LEXIS 228198 (D. Md. Dec. 4, 2020); *Kadow v. First Fed. Bank*, No. PWG-19-566, 2022 U.S. Dist. LEXIS 159848 (D. Md. Sept. 2, 2020).[12]

---

[12] Defendants raised similar arguments in *Somerville*, No. PJM-19-490, and *Brasko*, No. SAG-20-3489.  In both cases, the court rejected Defendants' conflict of interest argument regarding Plaintiffs' counsel.  In *Brasko*, Judge Gallagher

>       ii.       ***Prosecute Action Vigorously***

>           a.       <u>**Class Representatives**</u>

"Rule 23 does not require the representative plaintiffs to have extensive knowledge of the intricacies of litigation, rather, the named plaintiffs must have a general knowledge of what the action involves and a desire to prosecute the action vigorously." *Benway v. Res. Real Estate Servs., LLC*, 239 F.R.D. 419, 425 (D. Md. 2006). Defendants do not dispute that the named Plaintiffs satisfy the second prong of the adequacy requirement.

The Unthanks and Wilson have participated in depositions, responded to class discovery, and reviewed documents which demonstrates they have general knowledge of what the litigation involves, that they have knowledge about their loan transactions, and that they have a desire to prosecute the action vigorously. *See Benway*, *supra*. Accordingly, the named Plaintiffs satisfy Rule 23(a) adequacy.

>           b.       <u>**Class Counsel**</u>

Defendants also do not dispute that Plaintiffs' counsel satisfies the second prong of the adequacy requirement. The putative Class counsel in this case "routinely practice[s] in the areas of complex commercial litigation and class actions." (ECF No. 112-1, at 26.) Additionally, Plaintiffs' counsel has been appointed as class counsel in similar cases, including *Brasko*, 2022 U.S. Dist. LEXIS 57627, *Bezek*, 2020 U.S. Dist. LEXIS 183174, *Dobbins*, 2020 U.S. Dist. LEXIS 156315, *Edmondson*, 336 F.R.D. 108, *James*, 2020 U.S. Dist. LEXIS 96633, and *Fangman*, 2016 U.S. Dist. LEXIS 154582. The court finds that Plaintiffs' counsel will adequately represent the putative Class. *See* 1 B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3.72 (6th ed.

---

reasoned: "[e]ven if there were a conflict between Plaintiffs and/or their counsel about whether to pursue claims against All Star, that is not a conflict that goes to the heart of Plaintiffs' litigation against First Mariner." 2022 U.S. Dist. LEXIS 57627, at *26-27.

2022) (explaining that "[t]he fact that proposed counsel has been found adequate in other class actions often supports the conclusion that the attorney will be adequate in the present action").

## IV. **Rule 23(b) Requirements**

Plaintiffs move to certify the class pursuant to Rule 23(b)(3), which requires a finding that "the questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3).

### A. **Predominance**

"Rule 23(b)(3)'s requirement that common questions of law or fact predominate over individual ones is similar to, but 'far more demanding' than Rule 23(a)'s commonality requirement." *In re Marriott Int'l, Inc.*, 341 F.R.D. 128, 154 (2022). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods*, *Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50 (5th ed. 2012)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* at 453-54 (quoting 7AA C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* §1778, pp. 123-124 (3d ed. 2005) (footnotes omitted)). "Rule 23(b)(3) 'does not require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof,' but it 'does require [] that common questions predominate over any questions affecting only individual [class] members.'" *In re Marriott Int'l*, 341 F.R.D. at 155 (quoting *Amgen Inc. v. Conn. Ret. Plans*

*& Trust Funds,* 568 U.S. 455, 469 (2013).).  "Ultimately, the predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Id.* (quoting *Tyson Foods*, 577 U.S. at 453).

"In considering the Rule 23(b)(3) predominance requirement, 'a court's rigorous analysis begins with the elements of the underlying cause of action.'"  *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 344 (D. Md. 2012).  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311.  "[A]t the class certification stage, Plaintiffs need only show by a preponderance of the evidence that these elements are 'capable of proof at trial through evidence that is common to the class rather than individual to its members.'"  *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 344 (D. Md. 2012) (*quoting In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311-12)).

The court will first address Defendants' argument regarding uninjured Class members prior to conducting its analysis of the causes of action.  Subsequently, in analyzing the causes of action, the court will address Defendants' arguments that (1) the only way to establish if a Class member suffered an overcharge is to look at each transaction individually, and (2) the wide variation in fees Defendants charged prevents Plaintiffs from satisfying their burden to demonstrate that their claims are readily susceptible to class-wide proof.

### i.    *Uninjured Class Members*

Defendants argue that predominance is not met because some absent class members were not overcharged at all.  (ECF No. 127 at 36.)  While the court addressed Defendants' standing arguments in Section I, "[c]ourts often address [the] issue of 'uninjured class members' in the

context of Rule 23(b)(3)'s predominance requirement." *In re Marriott Int'l*, 341 F.R.D. 128,141 (2022).

"Plaintiffs must show that differences between class members as to standing—*i.e.*, the inclusion of uninjured individuals alongside injured ones in the class—are not so significant that the class runs afoul of Rule 23." *Id.*  In *Marriott*, the court narrowed the class definitions because "the number of uninjured class members could be in the thousands." *Id.* at 142.  Accordingly, the *Marriott* court concluded that "sizeable portions of the various classes have differing legal arguments as to standing, undoing the cohesiveness of the classes and preventing common questions of law from predominating." *Id.*  Therefore, it is clear that "a class should not be certified 'if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *In re Zertia Ezetimibe Antitrust Litig.*, No. 18-md-2836, 2020 U.S. Dist. LEXIS 183601, at *52 (E.D. Va. Aug. 13, 2020) (quoting *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)).

As discussed above, legal issues relating to standing are better resolved at the summary judgment stage after discovery; at this stage, Plaintiffs have set forth sufficient evidence that they and absent Class members suffered concrete injury.  *See* Section I, *supra*.

Defendants argue that the number of uninjured Class members defeats predominance because an analysis of the 52 HUD-1 loans demonstrates an absence of overcharge.  (ECF No. 127, p. 33.)  Plaintiffs' claimed injury "is that they paid more for settlement services than they would have absent the kickback agreement." *Bezek*, 2020 U.S. Dist. LEXIS 183174, at *15.  The court recognizes that, ultimately, Plaintiffs bear the burden to demonstrate Article III standing for each Class member; however, the court is unconvinced that the Class as defined "contains a great

many persons who have suffered no injury."  *See In re Zertia Ezetimibe Antitrust Litig.*, *supra*.

Defendants may continue to raise arguments regarding Article III standing as the case progresses.

### ii.        *Real Estate Settlement Procedures, 12 U.S.C. § 2607(a)*

As discussed *supra*, Plaintiffs allege that all RESPA Subclass members were victims of an

alleged kickback scheme between Eagle Defendants and All Star.  The named Plaintiffs bring

claims under 12 U.S.C. § 2607(a), which provides, "No person shall give and no person shall

accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or

otherwise, that business incident to or a part of a real estate settlement service involving a federally

related mortgage loan shall be referred to any person."  12 U.S.C. § 2607(a).  "RESPA explicitly

provides borrowers with a private right of action against '[a]ny person or persons who violate' the

anti-kickback provision, and provides the borrower-plaintiff with the right to recover damages 'in

an amount equal to three times the amount of any charge paid for such settlement service.'"  *James

v. Acre Mortg. & Fin., Inc.*, No. SAG-17-1734, 2020 U.S. Dist. LEXIS 96633, at *16 (D. Md. June

2, 2020) (quoting 12 U.S.C. § 2607(d)(2)).

"In order to prevail on their claims, the class members must all prove (1) a payment of a

thing of value, (2) given and received pursuant to an agreement to refer settlement business, and

(3) an actual referral."  *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 U.S. Dist. LEXIS

154582, at *12 (D. Md. Nov. 8, 2016)).  In *Freeman v. Quicken Loans, Inc.*, the Supreme Court

instructed that a violation of § 2607(a) "requires an 'agreement or understanding' to refer

business," but not a showing that the kickback agreement is "tied in any respect to a charge paid

by a particular consumer."  566 U.S. 624, 636 (2012).  An agreement or understanding "may be

established by a practice, pattern or course of conduct."  12 C.F.R. § 1024.14(e) (2023).

Here, the essence of each proposed Class member's claim against Eagle Defendants is that Eagle Defendants referred them to All Star settlement services because All Star promised, and ultimately did provide, kickbacks to Eagle Bank that were laundered through third-party marketing companies. "Whether this widespread scheme existed and, if so, how it was executed are common questions 'at the heart of the litigation' that will produce common answers." *Brasko*, 2022 U.S. Dist. LEXIS 57627, at *12 (quoting *EQT*, 764 F.3d at 366). Plaintiffs proffer evidence demonstrating that Eagle Defendants engaged in a "pattern or practice of receiving things of value from All Star and, in return, assigning Eagle loans to All Star." (ECF No. 112-1, p. 31.) Indeed, this evidence requires the named Plaintiffs and putative Class members to "rely on one another's individual loan transactions to establish a 'practice, pattern or course of conduct.'" *See James*, *supra*. Additionally, RESPA's statutory damages will be calculated the same class-wide. *See* 12 U.S.C. § 2607(d)(2) (2023) ("Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.").

Accordingly, with respect to Plaintiffs' RESPA claim, the court finds that common questions of law and fact predominate over any individualized inquiry.

### iii.    Sherman Act, 15 U.S.C. § 1

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). While § 1 is broad and "could be interpreted to proscribe all contracts, the Court has never 'taken a literal approach to its language.'" *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (quoting *Texaco Inc.*, 547 U.S. at 5) (internal

citations omitted).  "Rather, the Court has repeated time and again that § 1 'outlaw[s] only unreasonable restraints.'" *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).  "To establish an antitrust violation, a plaintiff must prove three elements: (1) a violation of the antitrust laws— here, Section 1 of the Sherman Act; (2) individual injury resulting from that violation; and (3) measurable damages." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 344 (D. Md. 2012).

### a.    <u>Violation of Antitrust Law</u>

"The first question is whether, based on Plaintiffs' proposed proof, Plaintiffs have demonstrated that they will prove a classwide antitrust violation." *DeLoach v. Philip Morris Cos*, 206 F.R.D. 551, 560 (M.D.N.C. 2022).  A plaintiff must demonstrate "concerted activity" "in which multiple parties join their resources, rights or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing choices." *Va. Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 281-82 (4th Cir. 2002).  This requires "direct or circumstantial evidence that reasonably tends to prove that" the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)).  The "anticompetitive conduct" must stem "from an agreement, tacit or express." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007).  Agreements that occur between "competitors at the same level of the market structure" are termed "horizontal," while agreements between "persons at different levels of the market structure" are "termed vertical." *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972).

"[C]ertain recurring business practices, because of their pernicious effect on competition, are considered illegal per se under the Sherman Act." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 691 F.2d 678, 683 (4th Cir. 1982).  "The critical analysis in determining whether a particular

activity constitutes a per se violation is whether the activity on its face seems to be such that it would always or almost always restrict competition and decrease output instead of being designed to increase economic efficiency and make the market more rather than less competitive." *Nat'l Elec. Contractors Ass'n, Inc. v. Nat'l Constructors Ass'n*, 678 F.2d 492, 500 (4th Cir. 1982). The Supreme Court has repeatedly held that "[p]rice-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are per se unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

Plaintiffs allege that Defendants "conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans." (ECF No. 33 ¶ 50.) Plaintiffs further allege that Eagle Defendants' price fixing agreement extended to their internal title company, Eagle Nationwide Title Agency. *Id.* ¶¶ 84-89. This type of horizontal price-fixing scheme, if it existed, is a *per se* violation of the Sherman Act. The alleged price-fixing agreements between Eagle Defendants and All Star are alleged to arise from a single course of wrongful conduct. The factual questions surrounding the existence and implementation of price-fixing agreements, including affirmative actions to conceal the same, predominate over issues related to individual class members. "[T]he same evidence will suffice for each member to make a prima facie showing" of a violation of 15 U.S.C. § 1. *See Tyson Foods*, *supra*. "[T]he allegations of price-fixing relate to the defendants' conduct, therefore proof will not vary among the class members." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.C. Cir. 2002). Accordingly, the court finds that the issues of law and fact regarding Plaintiffs' proof of

Defendants' alleged price fixing agreement is common to the proposed class and predominates over individualized inquiries.

          **b.**      **Impact**

The second element of an anti-trust violation involves whether the Class members "suffered injury from the alleged price-fixing conspiracy." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. at 344. "[A]t this stage in the litigation, the Plaintiffs need not prove this element, '[i]nstead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Id.* at 345 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311-12). "Plaintiffs' burden of showing antitrust impact is 'satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969)). Plaintiffs have proffered sufficient evidence that the alleged price fixing agreements "were artificially elevated from All Star's charges for borrowers from lender[s] not receiving kickbacks." (ECF No. 112-1 at 29.) Plaintiffs permissibly rely upon numerous communications by Eagle Defendants to demonstrate that the impact of the conspiracy is provable on a class-wide basis. Accordingly, the court finds that the issues of fact and law relating to proof of impact are common to the proposed Class and predominate over individualized issues.

          **c.**      **Damages**

"In addition to proving classwide impact, Plaintiffs must show that damages are susceptible of common proof." *DeLoach v. Philip Morris Cos.*, 206 F.R.D. 551, 564 (M.D.N.C. 2002). "In contrast to the 'impact' prong of the Rule 23(b) analysis, which asks only 'whether the plaintiffs

were harmed,' the damages prong asks 'by how much.'" *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. at 348 (quoting *In re EPDM Antitrust Litig.*, 256 F.R.D. at 88). "[I]n a price fixing case, impact and damages are coextensive; the overcharge constitutes the plaintiff's injury (impact) as well as the measure of his damage (damages) and is the difference between the price actually paid and the price he would have paid absent the conspiracy." *Ohio Valley Electric Corp. v. General Electric Co.*, 244 F. Supp. 914, 933 (S.D.N.Y. 1965). "A plaintiff in an antirust case need only introduce evidence sufficient for a jury to estimate the amount of damages. . . . [and] [c]ourts are willing to accept some measure of uncertainty due to the difficulty of ascertaining damages and the fact that what plaintiff's position would have been absent the antitrust violation is never known with certainty." *DeLoach*, 206 F.R.D. at 564.

Plaintiffs provide sufficient evidence to satisfy the damages prong. Plaintiffs contend that, under the price fixing agreements, "[a]ny amount higher than '$1000 including title insurance' is the amount of each Eagle Class members' antitrust damages." (ECF No. 112-1 at 30.) This is corroborated by Plaintiffs' preliminary evidence, including an email from All Star setting the fee for borrowers not participating in the alleged kickback scheme. (ECF No. 112-15, Ex. 14.) Accordingly, the court concludes that each element of the antitrust claim is provable on a class-wide basis and common questions of law and fact predominate over questions affecting only individual members.

### B.   Superiority

Rule 23(b)(3) requires the court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Defendants do not take issue with this factor. As discussed above, all putative Class members' claims arose out of the same alleged kickback scheme and price fixing agreement. As Plaintiffs

argue, each putative Class members' claim, "is tied to proof of this scheme and will necessarily involve overlapping evidence, discovery, witnesses and testimony." (ECF No. 112-1 at 35.) Further, the same damages calculation will apply class-wide. The court is also satisfied that all members of the Class will and may "rely on one another's individual loan transactions to establish a 'practice, pattern or course of conduct.'" *See James*, *supra*; 12 C.F.R. § 1024.14(e). The court is not aware of any other litigation against Eagle Defendants' involving the same claims, or that this forum is improper. *See* FED. R. CIV. P. 23(b)(3)(B)-(C).

Finally, the court discerns no difficulties in managing the class action. If an issue arises, the court may alter or amend the class definition or decertify the class. *See* FED. R. CIV. P. 23(c)(1). Thus, "a class action is more efficient than allowing potentially hundreds of individual claims arising from this purported kickback arrangement." *See Edmondson*, 336 F.R.D. at 116. Accordingly, the court finds that all Rule 23(a) and 23(b)(3) conditions for class certification are met.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' Motion for Class Certification (ECF No. 112) is granted. An accompanying Order follows.

/S/

_____
Julie R. Rubin
United States District Judge