IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SAM WILSON, JR., *et al.*,

      *Plaintiffs*,

      v.

EAGLE NATIONAL BANK, *et al.*,

      *Defendants*.

Civil No.: 8:20-cv-01344-JRR

## <u>MEMORANDUM OPINION</u>

Pending now before the court are Plaintiffs' Motion for Partial Summary Judgment at ECF No. 307 ("Plaintiffs' Motion") and Defendants' Motion for Summary Judgment at ECF No. 312 ("Defendants' Motion"). Following briefing by the parties, the court convened a hearing on June 4, 2026, the discrete issue raised in Defendants' Motion regarding Pennsylvania's statute of repose and its impact on Plaintiffs' claims in this action due to a material change in law that occurred after the parties' briefing. At that hearing, the parties also advanced argument on Plaintiffs' joint venture theory of liability and Sherman Act claim. The court has reviewed all papers; no additional hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, Defendants' Motion will be granted, and Plaintiffs' Motion will be denied as moot.[1]

---

[1] The court will also deny as moot Defendants' other pending motions—their Motion to Decertify Class (ECF No. 315) and their Motion in Limine to Exclude Opinions and Testimony of William Watkins (ECF No. 319).

I.    **<u>BACKGROUND AND UNDISPUTED FACTS</u>**[2]

Plaintiffs Sam Wilson, Jr., and John and Jackie Unthank initiated the instant action on May 29, 2020; the present Defendants are Defendant Eagle Nationwide Mortgage Company ("ENMC"), Eagle National Bank ("ENB") (together, "Eagle Defendants"), and ESSA Bank & Trust ("ESSA").  (ECF Nos. 1, 300.)  Plaintiffs and alleged Class Members, "borrowers who currently have or had a federally related mortgage loan originated and/or brokered by" Eagle Defendants, allege they are "victims of an illegal kickback scheme . . . under which the Eagle Defendants' loan officers, agents, and/or other employees received and accepted illegal kickbacks from All Star Title, Inc. ('All Star') . . . in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ('RESPA'), 12 U.S.C. §§ 2601, *et seq.*" (ECF No. 300 ¶¶ 1–2.)  They also allege All Star and Eagle Defendants "conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1."  *Id.* ¶ 199.  Plaintiffs assert two claims: one claim under RESPA (Count I); and a second claim under the Sherman Act, 15 U.S.C. § 1 (Count II).  *Id.* ¶¶ 179–216.

During the relevant period, ENMC was the wholly owned subsidiary of ENB, and Eagle National Bancorp, Inc., was the holding company of both ENMC and ENB.  (Feb. 28, 2024, Bromley Dep. Tr., ECF No. 312-2 at 111:9–112:13; ECF No. 300 ¶¶ 8–10; ECF No. 312-1at pp. 5–6.)  ESSA Acquisition Corp. later merged with and into Eagle National Bancorp., Inc., following

---

[2] In addressing the undisputed facts before the court, the court refers at times to Plaintiffs' allegations and the parties' respective theories (of liability, defense, and the case as a whole).  The court does so only to explain something against the backdrop of its relevant context.  The court does not take pleading allegations as true for purposes of the Motions and makes no findings of fact whatsoever; rather, the court cabins its analysis strictly within the confines of the Rule 56 standard addressed *infra*.

which Eagle National Bancorp., Inc., as the surviving entity, merged with and into ESSA Bancorp, Inc.[3]  (ECF No. 307-1 at pp. 3–4; ECF No. 312-1 at p. 12.)    Thereafter, ENB merged with and into ESSA.  *Id.*  Based on the parties' briefings and representations at the hearing, Plaintiffs' claims stem from alleged violations of RESPA and the Sherman Act by ENMC (rooted in ENMC's own alleged liability); alleged derivative liability of ENB for ENMC's violations, as well as joint venture liability for same, and ENB's own violations of the Sherman Act; and alleged successor liability of ESSA for ENB's liabilities.[4]

### A.  ENMC's Creation and Dissolution

After shutting down its mortgage department in 2003, ENB re-entered the mortgage business in 2007 through its wholly owned subsidiary, ENMC, and through the purchase of Sunset Mortgage Company's assets.  (Feb. 28, 2024, Bromley Dep. Tr., ECF No. 312-2 at 117–16; 26:1–10; 75:24–76:16; 104:19–105:20; Apr. 27, 2007, Board of Directors Minutes, ECF No. 313-8; Fixed Asset Purchase Agreement, ECF No. 313-9.)    ENMC eventually dissolved on October 28, 2016.  (Articles of Dissolution, ECF No. 313-23.)    It received its dissolution clearance certificate from Pennsylvania's Department of Labor & Industry on June 7, 2016, and from Pennsylvania's Department of Revenue on October 14, 2016.  *Id.*  The precise nature of the relationship between ENMC and ENB is hotly contested in this action, with Plaintiffs pointing to evidence supporting their theory that ENB operated ENMC merely "as a division" of ENB and "for the benefit of [ENB], not ENMC," *see* ECF No. 300 ¶ 9, and Defendants pointing to evidence that ENB operated

---

[3] Per the court's order at ECF No. 299 permitting Plaintiffs to file a Second Amended Complaint, Eagle National Bancorp, Inc., and ESSA Bancorp, Inc., were removed as Defendants.  (ECF Nos. 298, 299.)

[4] For the reasons set forth below, the court does not understand Plaintiffs to advance any other theory of liability (*e.g.*, respondeat superior or joint employer) where they opted not to respond to Defendants' arguments on such theories and otherwise failed to make argument in support of same.  Thus, except for the liability theories described above, any other theories Plaintiffs may have proceeded under at one time have been abandoned.  Further, at the June 4 hearing, defense counsel asserted Plaintiffs abandoned or conceded theories where they did not oppose Defendants' motions papers on same; Plaintiffs' counsel did not contend otherwise.

ENMC as a subsidiary and in accordance with the regulations from the Office of the Comptroller of the Currency ("OCC"), *see* ECF No. 312-1 at pp. 5–10.

### B. Plaintiffs' Sherman Act Allegations

With regard to Plaintiffs' Sherman Act claim, the alleged violations flow from a purported conspiracy between Eagle Defendants, via Eagle National Bancorp.'s bank operating subsidiary, Eagle Nationwide Abstract Company ("Eagle Title"), and All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company.  (ECF No. 300 ¶ 2.)  *See also* Hand drawn chart, ECF No. 312-16; Feb. 28, 2024, Bromley Dep. Tr., ECF No. 312-2 at 111:9–112:13.  In particular, Plaintiffs allege:

> All Star and the Eagle Defendants conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1.
>
> .            .            .
>
> During the relevant time period, the Eagle Defendants operated, maintained an ownership interest in and/or controlled Eagle Title.
>
> Eagle Title functioned as the Eagle Defendants' internal title company and the Eagle Defendants extended their price fixing agreements with All Star to the prices charged for similar title and settlement services by Eagle Title.
>
> The fixed prices agreed to and charged by the Eagle Defendants and All Star pursuant to the Price Fixing Agreements are an unreasonable restraint of trade . . . .

 (ECF No. 300 ¶¶ 199, 201–202.)

Plaintiffs identify a purported "All Star Title-ENMC-ENB-Eagle Title Price Fixing Agreement" that forms the basis of their Sherman Act claim.  On this agreement, Plaintiffs offer the following evidence:

> In communications with ENMC, Rob Selznick, All Star Title's Senior Account Manager, conveyed that, if All Star was not paying kickbacks for loan referrals, it was able to set its pricing for title and settlement services at $1,000.00 including the cost of title insurance. *See* Sep. 15, 2010 Selznick e-mail, Exhibit 54 ("If you choose NOT to use All Star's Marketing Plan, the title fees will be at the agreed-upon price of $1000 including title insurance."). This structure was approved by Jason Horwitz, All Star's owner. See Dec. 20, 2023 Selznick Deposition, Exhibit 55 at 107:8-109:6. Horwitz himself communicated to ENMC that, when All Star did provide marketing (i.e., kickbacks), it set its fees at $2,000.00. See June 4, 2010 Horwitz email, Exhibit 57 ("just an fyi – if we do any kinda co-marketing we set our fees at $2000"). At around the same time, Eagle Title, which had previously met with ENMC branch managers—in conjunction with ENB Officers Schaen and Morelli, and ENB President Bromley—to facilitate its own kickback arrangement (*See* §B(5), *supra*), set prices for title and settlement services at $2,000.00 and above. *See* collected List of Settlement Service Providers and Affiliated Business Disclosure Forms, Exhibit 56. ENMC provided these forms to its borrowers to identify Eagle Title as an alternative settlement service provider to All Star—but the fees were not competitive.

(ECF No. 332 at pp. 22–23.)   Plaintiffs contend that ENB and Eagle National Bancorp. "participated in a plan intended to steer title and settlement services business from [ENMC] to [Eagle Title] . . . in exchange for the payment of kickbacks from Eagle Title."  (ECF No. 300 ¶ 45.)

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a factfinder for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). A party "need[s] to present more than their own unsupported speculation and conclusory allegations to survive." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023). Further, "[u]nder this standard, 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Wai Man Tom v. Hospitality Ventures, LLC*, 980 F.2d 1027, 1037 (4th Cir. 2020) (quoting *Anderson*, 477 U.S. at 252).

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted).

6

In so doing, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (citations omitted); *see Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 574 (D. Md. 2021) (same).    Because Defendants' Motion would have the effect of mooting Plaintiffs' Motion, the court considers Defendants' Motion first.

III.    **ANALYSIS**

   **A.  Claims against ENMC and Derivative Liability Claims against ENB and ESSA**

   Defendants first argue that Plaintiffs' claims against ENMC and derivative liability claims against ENB and ESSA are barred by Pennsylvania's corporate dissolution statute, 15 PA. CONS. STAT. § 1979(a) ("Section 1979"), which acts as a statute of repose.  (ECF No. 312-1 at p. 1, 14–17.)  A state-enacted statute of repose "bars any suit that is brought after a specified time since the defendant acted . . . , even if this period ends before the plaintiff has suffered a resulting injury." *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014) (citation omitted and modified).  Unlike a statute of limitations that "creates a time limit for suing in a civil case, based on the date when the claim accrued," a statute of repose "puts an outer limit on the right to bring a civil action." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 812 (2024) (quoting *CTS Corp.*, 573 U.S. at 8).  "Equivalent to a 'cutoff,' a statute of repose operates as a substantive bar to liability, reflecting a legislative policy judgment that no legal right should be recognized after a statutorily determined end point." *Prasad v. Holder*, 776 F.3d 222, 226 (4th Cir. 2015).  They are generally "treated as 'absolute time limit[s]' and are 'not tolled for any reason.'" *Prasad v. Holder*, 776 F.3d 222, 226 (4th Cir. 2015) (quoting *First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862, 866 (4th Cir. 1989)).  For instance, the Supreme Court "repeatedly has

stated in broad terms that statutes of repose are not subject to equitable tolling." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 508 (2017).

At issue here, Section 1979 "ensures that the dissolution of a corporation does 'not eliminate nor impair any remedy available to or against' it for a period of two years." *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 358 (3d Cir. 2013). It specifically provides:

> The dissolution of a business corporation, either under this subchapter or under Subchapter G (relating to involuntary liquidation and dissolution) or by expiration of its period of duration or otherwise, shall not eliminate nor impair any remedy available to or against the corporation or its directors, officers or shareholders for any right or claim existing, or liability incurred, prior to the dissolution, if an action or proceeding thereon is brought on behalf of:
>> (1) the corporation within the time otherwise limited by law; or
>> (2) any other person before or within two years after the date of the dissolution or within the time otherwise limited by this subpart or other provision of law, whichever is less. See sections 1987 (relating to proof of claims), 1993 (relating to acceptance or rejection of matured claims) and 1994 (relating to disposition of unmatured claims).

15 PA. CONS. STAT. § 1979(a). The purpose of Section 1979 is "to provide 'an orderly procedure' for corporations that wish to dissolve in fact—and so no longer to exist in *any* form—and 'to fix a time beyond which the shareholders need no longer concern themselves about the possibility that creditors might assert claims which could upset the dissolution.'" *Johnson v. SmithKline Beecham Corp.*, 853 F. Supp. 2d 487, 496–97 (E.D. Pa. 2012), *aff'd,* 724 F.3d 337 (3d Cir. 2013) (emphasis in original) (quoting *Am. Optical Co. v. Phila. Elec. Co.,* 228 F. Supp. 293, 295 (E.D. Pa. 1964)).

Defendants argue that based on Section 1979, Plaintiffs' claims against ENMC and derivative claims against ENB and ESSA are barred. In response, Plaintiffs initially contend that Defendants' argument is foreclosed by an opinion from the Superior Court of Pennsylvania, *In re Dravo LLC-Derivative Claims*, 307 A.3d 146, 154 (Pa. Super. 2023) ("*Dravo I*"). Plaintiffs assert:

8

> The Superior Court of Pennsylvania rejected this very position in *In re Dravo LLC-Derivative Claims*, 307 A.3d 146, 154, 2023 PA Super 268 (2023). *Dravo* involved asbestos claims pressed against a parent company for wrongful conduct perpetrated by a dissolved LLC it owned. 307 A.3d, at 152. Like in this case, Plaintiffs sought to hold the parent liable on a veil piercing theory. *Id.* The *Dravo* Court held that §1979(a)(2)'s two-year statute of repose does not apply to parent companies that dissolve the entity that would be the subject of the primary suit. *Id.*, at 154 and n.4. Under *Dravo*, there is no statutory bar to holding ENB (and its successor ESSA Bank) liable for ENMC's RESPA and Sherman Act violations on a veil piercing theory.

(ECF No. 332 at pp. 23–24.)

Of material importance here, on May 22, 2026, the Supreme Court of Pennsylvania reversed the Superior Court of Pennsylvania's judgment in *Dravo I*, finding that the equitable remedy of veil piercing is not available to plaintiffs whose claims were otherwise time-barred by the applicable statute of repose. *In re Dravo LLC-Derivative Claims Against Carmeuse Lime, Inc.*, — A.3d —, No. 33 WAP 2024, 2026 WL 1458853, at *1 (Pa. May 22, 2026) ("*Dravo II*"). The Supreme Court's *Dravo II* opinion turned on application of Pennsylvania's Uniform Limited Liability Company Act of 2016 (the "LLC Act") that, like Section 1979, "provides a mechanism for Pennsylvania limited liability companies to dissolve and wind up their activities and affairs." *Id.* The question before it was "whether plaintiffs who filed tort claims against a dissolved LLC that are otherwise time barred pursuant to the LLC Act may nevertheless pursue those claims under the theory that the plaintiffs can pierce the protective veil of the LLC to recover against the LLC's surviving parent company." *Id.* The Supreme Court of Pennsylvania answered this in the negative, holding "that the equitable remedy of veil piercing is not available to the plaintiffs under these circumstances" and reversing the decision of the Superior Court. *Id.* The court reasoned:

> Paramount to the instant matter, "[a] request to pierce the corporate veil is not an independent cause of action[ ] but[,] rather[,] is a means of imposing liability established in an *underlying cause of action*,

9

such as tort or breach of contract, against another." *Golden Gate*, 194 A.3d at 1035 (emphasis added). Where a plaintiff seeks to pierce the corporate veil to impose a corporation or LLC's liabilities onto a parent entity or shareholder/member, at a bare minimum, the plaintiff must establish a viable cause of action exists against that corporation or LLC. In other words, if the plaintiff is unable to demonstrate that the corporation or LLC can face liability for the underlying cause of action, then the plaintiff cannot pierce the protective veil as a matter of law.

*Id.* at *11 (footnote omitted).

The Supreme Court then considered the facts before it—where the plaintiffs filed their asbestos claims in the trial court after the court-approved dissolution process and after the claim bar date:

[A]llowing Plaintiffs to pursue such claims against Dravo at this juncture would run contrary to the clear language of the Act. *See id.* § 8875(c). Indeed, Subchapter G of the LLC Act unambiguously evinces the General Assembly's intent to extinguish potential claims against an LLC at a specific point in time. Because equity follows the law, Plaintiffs cannot benefit from the equitable remedy of veil piercing where the LLC Act forbids all claims filed against Dravo after the July 13, 2020 claim bar date.

*Id.* at *12–13. The Supreme Court further noted that "[w]hile statutory claim bar dates may seem harsh to some, their existence and effect are no stranger to the law." *Id.* at *13.

Upon application here, *Dravo II* supports summary judgment in Defendants' favor on Plaintiffs' claims against ENMC and derivative liability claims (via ENMC) against the remaining Defendants. The relevant material facts underlying this inquiry are undisputed: ENMC, a Pennsylvania corporation, dissolved in 2016. (Articles of Dissolution, ECF No. 313-23.) Plaintiffs' claims, brought in 2020, were not filed "before or within two years after the date of the dissolution or within the time otherwise limited by this subpart or other provision of law." *See* ECF No. 1; 15 PA. CONS. STAT. § 1979(a). Indeed, Plaintiffs' claims were filed nearly two years after their claims were barred based on the dissolution date of October 28, 2016. In view of *Dravo*

*II*, Plaintiffs "cannot benefit from the equitable remedy of veil piercing where [Section 1979] forbids all claims filed against [ENMC] after the . . . claim bar date."[5]  *Dravo II*, 2026 WL 1458853, at \*12.  As a result, Plaintiffs' claims against ENMC fail, as do all derivative claims against the remaining Defendants.  *See Ryman v. First Mortg. Corp.*, 443 F. Supp. 3d 642, 653 (D. Md. 2020) (holding that, pursuant to the applicable state authorities at issue, the alter ego entity "may avail itself of [the dissolved entity's] statute of repose defense, and fend off Plaintiffs' claims").

Plaintiffs' arguments to the contrary are unavailing.  As set out at the start of this opinion, following *Dravo II*, the court convened a hearing as to what, if any, effect it has on this case. Notwithstanding Plaintiffs' pre-*Dravo II* position that *Dravo I* was dispositive of Defendants' statute of repose challenge, Plaintiffs now urge that its reversal is of no moment.  (ECF No. 332 at pp. 23–24.)  Specifically, at the hearing, Plaintiffs argued that *Dravo II* does not foreclose a veil piercing path of recovery because "federal common law governs the veil piercing analysis." Plaintiffs' contention, however, would have this court neglect Rule 17(b)(2) and the well-settled law upon which it is based.[6]

A corporation's capacity "to sue or be sued is determined . . . by the law under which it was organized."  FED. R. CIV. P. 17(b)(2).  *See Chrysler Credit Corp. v. Superior Dodge, Inc.*, 538

---

[5] While *Dravo II* addressed the LLC Act, the reasoning is applicable to Section 1979 and corporations.  The LLC Act bars claims against a dissolved LLC after it has provided the requisite notice "unless the claimant commences an action to enforce the claim against the [LLC] within two years after the publication date of the notice."  15 PA. CONS. STAT. § 8875(c).  Section 1979 similarly sets a time limit for individuals who seek a remedy against a dissolved corporation—requiring that such claims be brought "within two years after the date of the dissolution or within the time otherwise limited by this subpart or other provision of law, whichever is less."  15 PA. CONS. STAT. 1979(a)(2). Both statutes "unambiguously evince[] the General Assembly's intent to extinguish potential claims against [a corporate entity] at a specific point in time."  *In re Dravo LLC-Derivative Claims Against Carmeuse Lime, Inc.*, — A.3d —, No. 33 WAP 2024, 2026 WL 1458853, at \*12 (Pa. May 22, 2026).  Indeed, in laying the framework for its holding, the Supreme Court repeatedly referred to both corporations and LLCs.  *See id.* at \*10–11. Where the matter is one of statutory construction, the court finds *Dravo II* applicable here.  Plaintiffs do not contend otherwise.

[6] Plaintiffs' Motion certainly addresses application of federal common law to the veil piercing analysis, *see* ECF No. 332 at pp. 28–29, but as the court discusses herein, that is independent of the impact, if any, of the statute of repose.

F.2d 616, 617 (4th Cir. 1976) (discussing same); *Am. Optical Co. v. Philadelphia Elec. Co.*, 228 F. Supp. 293, 295 (E.D. Pa. 1964) (discussing same as to Section 1979).  "This rule applies to dissolved as well as active corporations." *Johnson v. Helicopter & Airplane Servs. Corp.*, 404 F. Supp. 726, 729 (D. Md. 1975) (collecting cases, including *Oklahoma Natural Gas Co. v. Oklahoma*, 273 U.S. 257, 260 (1927)).

Rule 17 effectively codifies a "well settled principle at common law and in the federal courts." *Johnson v. RAC Corp.*, 491 F.2d 510, 513 (4th Cir. 1974).  The Fourth Circuit's lengthy analysis bears repeating in full:

> 'It is well settled at common law and in the federal courts that a corporation which has been dissolved is as if it did not exist.' United States v. Safeway Stores (10th Cir. 1944) 140 F.2d 834, 836. All actions pending against it are abated and no new actions may be begun unless there is 'some statutory authority (of the state of incorporation) for the prolongation of its life, even for litigation purposes.' Chicago Title and Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp. (1937) 302 U.S. 120, 125, 58 S.Ct. 125, 127, 82 L.Ed. 147; Oklahoma Gas Co. v. Oklahoma (1927) 273 U.S. 257, 259, 47 S.Ct. 391, 71 L.Ed. 634; Sedgwick v. Beasley (1949) 84 U.S.App.D.C. 325, 173 F.2d 918, 919; International Pulp Equip. Co. v. St. Regis Kraft Co. (D.C.Del.1944) 54 F.Supp. 745, 748. Most jurisdictions have, however, chosen to provide by legislation 'for a partial continuation of the existence of a corporation after the termination of its corporate life, for the purpose of enforcing liabilities that had previously accrued against it. Statutes of this type are remedial and should be broadly and liberally construed.' United States v. Maryland & Virginia Milk Producers (D.D.C.1956) 145 F.Supp. 374, 375. Generally, these statutes fix a time limit within which suit must be filed after dissolution. The reason for such limitation was stated in Bishop v. Schield Bantam Company (D.C.Iowa, 1968) 293 F.Supp. 94, 96:
>
>> 'There should be a definite point in time at which the existence of a corporation and the transaction of its business are terminated. To allow, as the plaintiff contends, the continued prosecution of lawsuits perverts the definiteness and orderly process of dissolution so as to produce a continuous dribble of

12

> business activity contrary to the intent of the winding up provisions of the statute.'

> See, also, American Optical Co. v. Philadelphia Electric Co. (D.C.Pa.1964) 228 F.Supp. 293, 295; and Hern and Alexander, Effect of Corporate Dissolution on Products Liability, 56 Cornell L.Rev. 865, 913 (1971).

> Whether there is such statutory 'promulgation' of corporate life in a particular case, so as to permit 'a partial continuation of the existence of a corporation' after dissolution for purposes of suit, is determinable by reference to the laws of the state of incorporation of the dissolved corporation; Rule 17(b), Federal Rules of Civil Procedure, to this effect is no more than a restatement of a principle already firmly established in federal law. Wright & Miller, Federal Practice and Procedure, vol. 6, p. 738 (1971). Thus, in Oklahoma Gas Co. v. Oklahoma, supra, (273 U.S. at 259-260, 47 S.Ct. at 392) the Court put it:

>> 'The matter (of the capacity of a dissolved corporation) is really not procedural or controlled by the rules of the court in which the lit[i]gation pends. It concerns the fundamental law of the corporation enacted by the state which brought the corporation into being.'

*Id.*

Plaintiffs' attempts to avoid the settled nature of Rule 17(b) result in circular and confusing logic. At the hearing, Plaintiffs argued that *Dravo II* does not bar derivative liability claims because ENB is a national bank and its capacity to sue or be sued is not governed by Pennsylvania law. This mistakes the point. Where Plaintiffs' claims against ENB are based on derivative liability for ENMC, the question is not ENB's capacity to be sued, but ENMC's capacity. ENB's status as a national bank is of no moment, as the barrier to Plaintiffs' derivative liability claims stems from Plaintiffs' inability to pierce the corporate veil where there is no viable cause of action against ENMC as the subsidiary. *Dravo II*, 2026 WL 1458853 at * 11, *supra*. ENB's status as a national bank is neither here nor there; it does not bear on this analysis. As discussed above, where

ENMC's capacity to be sued is determined by the law of the state where it was incorporated—Pennsylvania, and Pennsylvania law bars Plaintiffs' claim against ENMC, Plaintiffs may not pursue claims against ENMC or avail themselves of the equitable remedy of veil piercing. That Plaintiffs' claims here are based in federal law does not compel a different result, because Rule 17(b) is not claim-specific. Capacity to be sued per Rule 17(b) is "neither limited to plaintiffs, nor dependent on the character of the specific claim involved in the litigation." 6A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1542 (3d ed. 2026); *see, e.g.*, *Ryman*, 443 F. Supp. 3d at 651 (concluding that a state statute of repose barred plaintiffs' RESPA claims against dissolved corporation and derivative claims brought on corporate veil and successor liability theories).

Accordingly, the court will grant Defendants' Motion to the extent it seeks summary judgment on Plaintiffs' claims against ENMC, and their claims based on derivative liability against ENB and ESSA.[7]

## B. Joint Venture Theory[8]

In opposition to Defendants' Motion for Summary Judgment, Plaintiffs assert for the first time that they have adduced sufficient evidence to proceed on a joint venture theory of liability. (ECF No. 332 at pp. 40–43.) Plaintiffs admit no such theory is mentioned or suggested in their operative complaint, *see id.* at p. 40 n.42), but contend Defendants were notified of Plaintiffs' intention to proceed on such a theory because different plaintiffs (represented by the same counsel

---

[7] With the exception of a joint venture theory, discussed *infra*, Plaintiffs have not asserted any other theories of liability as to ENB or ESSA. They did not advance any at the June 4 hearing or in their Motions' papers despite Defendants' arguments. *See also See Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) (noting that "[i]n failing to respond to [defendant's] argument," the plaintiff "concedes the point"); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (explaining that a plaintiff "abandon[s]" her claim where she failed to respond to argument).

[8] The parties agree that Pennsylvania law governs the applicability of any joint venture theory. (ECF No. 332 at pp. 40–43; ECF No. 342 at pp. 15–16.)

as Plaintiffs in this case) raised the theory in a case similar to this one against these same Defendants.  This is a nonstarter.

"It is axiomatic that Plaintiffs cannot advance one theory to support their claims in their pleadings and then introduce a new theory in opposition to Summary Judgment." *Emkey v. W.S.C., Inc.*, No. CV RDB-18-1304, 2019 WL 3945092, at *6 (D. Md. Aug. 21, 2019) (citing *3PD, Inc. v. U.S. Transport Corp.*, GJH-13-2438, 2015 WL 4249408, at *4 (D. Md. July 9, 2015)).  Indeed, while a plaintiff is not required to allege every fact upon which it will rely at summary judgment, "that does not mean that a plaintiff may plead one theory and one set of facts in his complaint, and then proceed to trial on an entirely different theory supported by entirely different facts." *Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 154 (4th Cir. 2020).   Proceeding as such "undermines the complaint's purpose and can thus unfairly prejudice the defendant." *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013).

In considering whether such a practice unfairly prejudices the defendant, the court is concerned with whether the defendant had fair notice of the claim and the evidence it needs to adduce to defend itself.  *Id.* at 946–47.  *See Hoffman v. Bear Chase Brewing Co., LLC.*, No. 1:21CV1443 (TSE/WEF), 2023 WL 384293, at *12 (E.D. Va. Jan. 18, 2023), *report and recommendation adopted sub nom.*, 2023 WL 2352926 (E.D. Va. Mar. 3, 2023) (describing "the hallmarks of a permissible constructive amendment" are generally "an opportunity to fully explore the issues in the discovery process and fair notice of the nature of the claim").  Here, while there can be no doubt Plaintiffs have advanced a new theory, Plaintiffs contend, and Defendants do not challenge, that the theory relies upon the same facts underlying their existing pled theories.  Indeed, Defendants candidly admit that they oppose Plaintiffs' new theory not on grounds of prejudice,

15

but rather futility.  Accordingly, in the absence of any prejudice, the court will consider Plaintiffs' joint venture theory.

"A joint venture is an association of persons or corporations, who by contract, express, or implied, agreed to engage in a common enterprise for their mutual profit."  *Gold & Co. v. Ne. Theater Corp.*, 281 Pa. Super. 69, 73 n.1 (1980) (quoting *Richardson v. Walsh Const. Co.*, 334 F.2d 334, 336 (3d Cir. 1964)).  It is a "special combination of two or more persons, where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation."  *McRoberts v. Phelps*, 391 Pa. 591, 598 (1958) (quoting 30 Am. Jur., Joint Adventures, § 3).  "A joint venture is not a status created or imposed by law; it is a relationship voluntarily assumed and arising wholly from contract."  *Snellbaker v. Herrmann*, 315 Pa. Super. 520, 526 (1983) (citing 2 Williston on Contracts 557, § 318A (3rd ed. 1959)).  Importantly, "the contract need not be express but may be implied from the acts and conduct of the parties."  *McRoberts v. Phelps*, 391 Pa. 591, 598–99 (1958); *see Fuhrman v. Mawyer*, No. 1:21-CV-02024, 2024 WL 1604603, at *11 (M.D. Pa. Apr. 12, 2024) (same).  The inquiry turns "on the facts and circumstances of each particular case," and its "existence or non-existence depends upon what the parties intended in associating together."  *Keeler v. Int'l Harvester Used Truck Ctr.*, 317 Pa. Super. 244, 247 (1983) (citation omitted).

The Supreme Court of Pennsylvania has identified "certain factors [that] are essential" to the existence of a joint venture, including: "(1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a 'joint proprietary interest and right of mutual control over the subject matter' of the enterprise; (4) usually, there is a single business transaction rather than a general and continuous transaction."  *Snellbaker v. Herrmann*, 315 Pa. Super. 520,

16

526–27 (1983) (quoting *McRoberts*, 391 Pa. at 599). "The absence of even one element is fatal to the existence of a joint venture." *Enari v. Davranov*, No. 3:24-CV-01101, 2026 WL 1265749, at *8 (M.D. Pa. May 8, 2026) (quoting *Odyssey Contracting Corp. v. Hercules Painting Co., Inc.*, 2022 WL 5237196, at *5 (W.D. Pa. Sept. 2, 2022)). Upon demonstrating the existence of a joint venture, liability for one member of the joint venture may be imputed to the other. *Allen v. Foxway Transportation, Inc.*, 705 F. Supp. 3d 297, 314 (M.D. Pa. 2023) (quoting *Ciotola v. Star Transportation & Trucking, LLC*, 481 F. Supp. 3d 375, 387 (M.D. Pa. 2020)). Plaintiffs, as the parties asserting the joint venture, bear the burden of proving same. *Enari*, 2026 WL 1265749, at *8 (quoting *McRoberts*, 391 Pa. at 598–600).

Ultimately, the court finds that Plaintiffs' invocation of a joint venture theory fails in multiple respects. First, the court is not persuaded that a parent and subsidiary may be joint venturers where the joint venture itself is the subsidiary. A basic mark of a joint venture is where "a profit is jointly sought without any actual partnership or corporate designation." *See McRoberts*, 391 Pa. at 598, *supra*. There is of course a corporate relationship between ENB as parent and ENMC as subsidiary here. And while there is some caselaw from other jurisdictions that such a corporate relationship may not foreclose entirely liability as joint venturers, *see Wirth v. Sun Healthcare Grp., Inc.*, 389 P.3d 295, 304 (N.M. Ct. App. 2016) (noting "it is at least conceivable that a parent may share a business venture with its subsidiary"); *Kissun v. Humana, Inc.*, 267 Ga. 419, 419 (1997) (noting "the parent/subsidiary relationship alone does not, as a matter of law, preclude such corporations from establishing the legal relationships of principal and apparent agent or joint venturers"), the court is not persuaded that such a relationship may be found where the purported joint venture is the subsidiary itself. *See Com. Club Bldg. LLC v. Glob. Rescue LLC*, 529 P.3d 383 (Utah Ct. App. 2023) (noting that, although it did not hold that parent and

17

subsidiary are incapable of creating a joint venture, "the joint venture of a parent corporation and a subsidiary corporation must be distinct from the subsidiary itself"). The court's conclusion is further bolstered by *Snellbaker* consideration that, in a joint venture, "usually, there is a single business transaction rather than a general and continuous transaction."[9] *Snellbaker*, 315 Pa. Super. at 526–27, *supra*.

Further still, that parent ENB purportedly controlled subsidiary ENMC's management and operations and shared profits does not support a joint venture where ENB was required by the applicable OCC regulation to exercise control of its subsidiary, *see* 12 C.F.R. § 5.34(e)(2)(i), eff. July 1, 2007 to July 20, 2011, to have consolidated financials with ENMC, *see id.*, requiring the operating subsidiary be consolidated with the bank under Generally Accepted Accounting Principles. Against this backdrop, the court agrees with Defendants that Plaintiffs' joint venture theory fails as a matter of law based on the undisputed material facts. The court will therefore grant Defendants' Motion in this respect.

## C. Sherman Act Claim

The court turns finally to Plaintiffs' Sherman Act claim against Defendants. As discussed above, Plaintiffs' Sherman Act claim rests on the allegation that "All Star and the Eagle Defendants conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1." (ECF No. 300 ¶ 199.) Specifically, Plaintiffs further allege that "Eagle Title functioned as the Eagle Defendants' internal title company and the Eagle Defendants extended

---

[9] The court acknowledges the caselaw appears to allow this factor some plasticity. *Compare McRoberts v. Phelps*, 391 Pa. 591, 600 n.15 (1958) (quoting language that "it usually, though not necessarily, applies to a single transaction"); *Snellbaker v. Herrmann*, 315 Pa. Super. 520, 527 (1983) (noting same), *with Odyssey Contracting, Corp. v. Hercules Painting Co., Inc.*, No. 2:17CV1255, 2022 WL 5237196, at *5 (W.D. Pa. Sept. 2, 2022) (noting the absence of even one element is fatal to finding a joint venture); *Enari v. Davranov*, No. 3:24-CV-01101, 2026 WL 1265749, at *8 (M.D. Pa. May 8, 2026) (same).

their price fixing agreements with All Star to the prices charged for similar title and settlement services by Eagle Title," and these "fixed prices agreed to and charged by the Eagle Defendants and All Star pursuant to the Price Fixing Agreements" acted as an unreasonable restraint on trade. (ECF No. 300 ¶¶ 201–202.)

"Section 1 of the Sherman Act provides that, '[e]very contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce* among the several States, or with foreign nations, is declared to be illegal." *Robinson v. Nat'l Collegiate Athletic Ass'n*, 172 F.4th 271, 287 (4th Cir. 2026) (emphasis in original) (quoting 15 U.S.C. § 1). Section 1 prohibits "only *unreasonable* restraints" of trade. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (emphasis in original) (quoting *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997)). "In practice, there are three avenues of analysis under section 1 of the Sherman Act that apply depending on how obviously anticompetitive the challenged conduct is: (1) per se liability, (2) quick-look scrutiny, and (3) rule of reason analysis." *Robinson*, 172 F.4th at 290 (quoting *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 373 (4th Cir. 2013)). At issue here, "[p]rice-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *see Robinson*, 172 F.4th at 290 n.10 (4th Cir. 2026) (recognizing same) (citing *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)). "To prove the existence of a horizontal price-fixing conspiracy, a plaintiff must demonstrate the following: '(1) the existence of an agreement, combination, or conspiracy, (2) among actual competitors, (3) with the purpose or effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity, (4) in interstate or foreign

19

commerce.'"[10]  *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 819 (D. Md. 2013) (quoting *In re Med. X–Ray Film Antitrust Litig.,* 946 F. Supp. 209, 215–16 (E.D.N.Y. 1996)).

At the core of Defendants' argument is their challenge to any purported conspiracy.  They contend Plaintiffs have failed to adduce any evidence of an agreement, combination, or conspiracy between All Star and Defendants.[11]  "[S]ection one's prohibition against restraint of trade applies only to concerted action, which requires evidence of a relationship between at least two legally distinct persons or entities."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) (quoting *Robertson v. Sea Pines Real Estate Cos.,* 679 F.3d 278, 284 (4th Cir. 2012)).  For conduct to be actionable then, "defendants must have specifically made a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Id.* (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764

---

[10] Plaintiffs' response to Defendants' arguments do not direct the court to any evidence in the record to support their contention that there is an agreement between actual market competitors.  Instead, Plaintiffs rely on the Honorable Theodore D. Chuang's characterizations of their pleadings on a 12(b)(6) sufficiency motion in *Wilson v. Eagle National Bank*, No. CV TDC-20-1344, 2021 WL 1238576 (D. Md. Apr. 2, 2021).  This of course is neither evidence nor relevant on a Rule 56 motion.  *See* FED. R. CIV. P. 56(c)(1), (e).  In his opinion, Judge Chuang noted:

> The fact that the Eagle Defendants, who were not themselves direct competitors with All Star, may have participated in, and even had a significant role in the execution of, the horizontal price-fixing conspiracy, provides a basis for holding them liable under the Sherman Act. Indeed, courts have identified and imposed liability for Sherman Act horizontal price-fixing conspiracies on entities that orchestrated the conspiracies but were not direct competitors, provided that there were at least two direct competitors who agreed with each other on the price-fixing.

*Wilson*, 2021 WL 1238576, at *4 (citing cases).  The sole evidence Plaintiffs appear to proffer on this point is that ENB encouraged an ENMC bank manager and loan officers to make referrals to Eagle Title for financial incentives.  *See* Apr. 2, 2024, Klopp Decl., ECF No. 332-10 ¶ 6; Apr. 23, 2009 Board Report, ECF No. 335-14.  (The court also notes that Defendants object to Plaintiffs' reliance on the Klopp Declaration when it was not produced in discovery, *see* ECF No. 342 at p. 20.)  Such evidence is hardly sufficient to show that ENB itself "orchestrated" a horizontal price-fixing conspiracy between competitors Eagle Title and All Star, such that it may be liable for same.  *See, e.g.*, *Wilson*, 2021 WL 1238576, at *4; *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015).  In any event, regardless of the non-direct competitor relationship between All Star and any Eagle Defendant, where Plaintiffs have failed to adduce evidence in support of a conspiracy, there is no basis on which a reasonable conclusion could be drawn that Eagle Defendants "participated in, and even had a significant role in the execution of, the horizontal price-fixing conspiracy."  *Wilson*, 2021 WL 1238576, at *4.

[11] Per the court's holding as to the statute of repose issue, the court's inquiry here focuses particularly on ENB and ESSA, and not ENMC; nonetheless, the court considers all for purposes of completeness.

(1984)). "There must be evidence that tends to exclude the possibility that [the entities] were acting independently." *Monsanto Co.*, 465 U.S. at 764. "[C]onscious parallelism" is not enough; instead, a plaintiff must show "parallel conduct *and* something 'more,'" such as circumstances that point "toward a meeting of the minds." *SD3*, 801 F.3d at 424 (citations omitted) (emphasis in original). "[P]roof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, . . . and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (citations omitted).

Plaintiffs agree that their conspiracy evidence is circumstantial. *See* ECF No. 332 at 45. They proffer the following evidence in support of an agreement, combination, or conspiracy between All Star and Eagle Defendants:

> Communication from All Star establishes that its "kickback-free" pricing was $1,000.00 including title insurance, but that when it paid kickbacks to ENMC, it fixed its price at $2,000.00. (Exs 54, 55). Eagle Title, a direct competitor of All Star, also set pricing at $2000.00 or above. 44 (Ex. 56). And Eagle Title had close ties with both ENMC and ENB, as demonstrated by the collaborative efforts by Eagle Title's President, Muscony, and by ENMC and ENB's officers Morelli and Schaen, to participate in kickback schemes with ENMC branches similar to those with All Star. (Exs. 10, 29, 30).

(ECF No. 332 at pp. 43–44.)

This evidence provides nothing more than the "conscious parallelism" that, alone, is insufficient to support a Sherman Act claim. Plaintiffs do not offer that "something more" upon which a reasonable factfinder could find a meeting of the minds. *See SD3*, 801 F.3d at 424, *supra*. Nor does the identified evidence "tend to rule out the possibility that the defendants were acting independently." *See Twombly*, 550 U.S. at 554, *supra*. The apparent evidence Plaintiffs rely upon is that All Star informed ENMC regarding its pricing for title and settlement services both with

21

and without kickbacks for loan referrals, *see* ECF No. 332 at pp. 22–23; Sept. 2010 E-Mail Correspondence, ECF No. 332-57; June 2010 E-Mail Correspondence, ECF No. 332-60, and that, "[a]t around the same time," Eagle Title . . . facilitate[d] its own kickback arrangement," and set prices at a similar level, *see* ECF No. 332 at p. 23; Settlement Service Providers, ECF No. 332-59. This evidence does not provide more than a mere "scintilla of evidence" in support of any purported conspiracy, and is thus insufficient to create a triable issue for a jury. *See Wai Man Tom*, 980 F.2d at 1037, *supra*. On this ground, Defendants are entitled to summary judgment.[12] Because the court concludes as such, it declines to reach Defendants' remaining arguments.

## IV.    **CONCLUSION**

For the reasons set forth herein, by separate order, the Defendants' Motion will be granted, Plaintiffs' Motion, along with other pending motions, will be denied as moot.[13]

June 15, 2026                                                    /S/

_____
Julie R. Rubin
United States District Judge

---

[12] As discussed above, to the extent Plaintiffs' Sherman Act claim is also brought against ENMC directly and against ENB and ESSA based on a derivative liability theory, the claims also fail pursuant to operation of Pennsylvania's corporate dissolution statute.

[13] While judgment will be entered in this matter, for administrative clarity, the stay of this case per the court's order at ECF No. 357 will be lifted.